STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Douglas H. CLAPPES, Defendant-Respondent. [Case No. 84–2001–CR.]

STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

David K. OSMAN, Defendant-Respondent. [Case No. 84–2252–CR.]

Supreme Court

*Nos. 84–2001–CR, 84–2252–CR. Argued September 5, 1986.— Decided March 6, 1987.*

(Also reported in 401 N.W.2d 759.)

223

For the plaintiff-appellant-petitioner the cause was argued by *David J. Becker*, assistant attorney general, with whom on the briefs was *Bronson C. La Follette*, attorney general.

For the defendant-respondent, Douglas H. Clappes, there was a brief by *Nila Jean Robinson* and *Robinson, Smith, Robinson & Peterson*, Appleton, and oral argument by *Nila Jean Robinson*.

For the defendant-respondent, David K. Osman, there was a brief by *Stephen F. Hansen* and *Johnson, Hansen, Shambeau & Johnson, S.C.*, Waupaca, and oral argument by *Stephen F. Hansen*.

LOUIS J. CECI, J. This is a review of an unpublished decision filed by the court of appeals on August 15, 1985. In this consolidated appeal brought by the state, the court of appeals affirmed two separate pretrial suppression orders which required that statements made by defendants Douglas H.

Clappes[1] and David K. Osman be suppressed on the grounds of involuntariness. The suppression orders were entered by the circuit court for Waupaca county, Frederic W. Fleishauer and Nathan E. Wiese, circuit judges. We reverse the court of appeals.

The substantive issues raised in this appeal essentially relate to the question of whether the state sustained its burden of proving beyond a reasonable doubt that certain admissions made by the defendants were voluntarily given. We hold that this court's prior decisions lead us to conclude that the admissions made by the defendants were voluntary since there was no affirmative police misconduct reflecting an attempt to improperly bring physical or psychological pressure to bear in order to compel the defendants to respond to police questioning. We further hold that the decision of the court of appeals has the effect of creating a *per se* rule prohibiting police questioning of individuals while they are undergoing medical treatment for injuries sustained while engaging in potentially criminal activity and, as such, must be struck down.

The facts in each case are set out separately below:

### Defendant Douglas H. Clappes

On May 20, 1980, Waupaca County Sheriff's Department Sergeant Don Morey (Morey) and Waupa-

---

[1]This case was previously before this court in *State v. Clappes,* 117 Wis. 2d 277, 344 N.W.2d 141 (1984), opinion by Steinmetz, J., in which this court held that police officers were not required to give *Miranda* warnings to Clappes before questioning him. The issue left unresolved in that appeal, but at issue here, deals with the voluntariness of statements made by Clappes during the police questioning.

ca County Deputy Sheriff Gerald Jorgenson (Jorgenson) responded to a late evening report made to the county sheriff's department of a one-car accident which occurred on county Highway E in Waupaca county. Upon arriving at the scene of the accident at approximately 11:40 p.m., less than ten minutes after the accident reportedly occurred, Morey and Jorgenson discovered a badly damaged vehicle which contained Michael A. Treloar, who was later pronounced dead at the scene of the crash by an examining physician. Police also discovered two other individuals strewn across a ditch located near the car: Douglas H. Clappes (Clappes), the owner of the vehicle, and Stacy Schroeder. Ms. Schroeder was also pronounced dead at the accident scene, although an attempt to revive her was made. According to the coroner's reports, both Treloar and Schroeder died as a result of massive head and chest injuries.

The defendant and the crash victims were transported by ambulance to nearby Riverside Hospital soon after the officers arrived. Morey and Jorgenson remained at the scene of the accident for one-half to three-quarters of an hour to direct traffic and to collect information for the accident report. Thereafter, the officers arrived at the hospital, where a positive identification of Treloar was made. The officers were unable at that time to obtain a positive identification of the female victim.

Morey and Jorgenson then entered the hospital emergency room, where Clappes was receiving treatment for lacerations, a ruptured bladder, a dislocated elbow, a fractured femur, a fractured pelvis, and shock. Permission to question the defendant was obtained from one of the emergency room physicians, and Morey proceeded to question the defendant, while

the defendant was receiving medical care, regarding the circumstances of the accident. Jorgenson recalled that the following exchange took place between Morey and Clappes during the questioning:

"THE WITNESS: And he was just off to the, facing, would be the left side of the table, and I was kind of on an oblique direction from him just basically right alongside him, and Officer Morey was in a very loud voice asking the defendant, Mr. Clappes, if he could hear him, and he stated he could; and he had asked who the girl was, and his reply was Stacy, and he said, 'What is her last name?' and he said, 'Schroeder;' and he said, 'Where does Stacy live?' and he said, 'On the back road to King;' and he asked if, where Stacy was sitting, and he said the front passenger side. He asked where Mike was sitting. He said in the back seat; and then he said, made it a statement more or less, 'And you were driving, is that right?' and he repeated that, as I recall, once again, 'And you were driving; is that right?' and he said 'Yes.'"

Morey testified that the disarray at the crash scene made it difficult, if not impossible, for the officers to obtain the information needed for the accident report at the accident site.

"THE WITNESS: We hadn't completed our accident report; things were hectic at the accident scene. Mr. Clappes and the young lady that was killed in the accident, Stacy Schroeder, were laying outside in the yard at the accident scene. They had been thrown from the vehicle. And the young man that was with them was dead. So, we were busy cleaning up the scene, trying to administer aid to Mr. Clappes and the young lady. So, there was not a real opportunity to talk to Mr. Clappes. We went

227

to confirm information that was required for the accident report and to confirm the identity of the young lady that was in the car."

Both officers testified that the defendant responded to each question posed to him, although at least two questions had to be repeated twice before the defendant responded. He appeared to the officers to be coherent, although he was experiencing great pain. In addition, both officers testified that Morey asked questions of the defendant in a louder than normal speaking voice, although Morey denied that he was shouting at the defendant. Morey testified that he asked the questions in an elevated speaking voice simply to ensure that the defendant would hear his questions.[2] Jorgenson also stated that he believed the only reason Morey raised his voice during questioning was "simply to get the defendant's attention so that he would be quiet and could hear and understand the questions."

The entire length of the questioning did not exceed two or three minutes. At no time did either officer threaten the defendant, touch him, or make him any promises in exchange for a response to the questioning, although Morey did stand just above Clappes as he was directing questions at him. Nor did

---

[2]At the time Clappes was being questioned, he was surrounded by at least six individuals who, at various times, were attending to his medical needs, including two doctors, several nurses and other hospital personnel. In addition, Morey testified that when the officers entered the emergency room, the defendant was squirming on the emergency room table, complaining of pain, and cursing the doctors. Given the activity level in the emergency room at that time, it is neither surprising nor inconceivable that Morey felt compelled to raise his voice in order to be heard.

the defendant ever request that the sergeant cease the questioning.

At the conclusion of the questioning, the defendant was placed under arrest. Jorgenson requested that an attending nurse take defendant's blood sample. A sample was taken, and the state laboratory of hygiene tested it for its blood alcohol content. The test disclosed that defendant's blood alcohol content by weight was 0.162 per cent.

The criminal complaint filed against defendant in July, 1980, charged him with violating sec. 940.09, Stats.[3] It also charged the defendant under sec. 343.44(1), with unlawfully operating a motor vehicle after revocation of his driver's license.

Defendant has argued throughout the proceedings that he remembers nothing about the accident, the treatment he received in the emergency room on the night of the crash, or the police questioning.

### Defendant David K. Osman

The facts in the *Osman* case are similar to those in *Clappes*. Like Clappes, Osman was involved in a single-car crash which occurred in Waupaca county.

---

[3]Section 940.09 provides:

"**Homicide by intoxicated user of vehicle or firearm.** (1) Any person who does either of the following under par. (a) or (b) is guilty of a Class D felony:

"(a) Causes the death of another by the operation or handling of a vehicle, firearm or airgun and while under the influence of an intoxicant;

"(b) Causes the death of another by the operation or handling of a vehicle, firearm or airgun while the person has a blood alcohol concentration of 0.1% or more by weight of alcohol in that person's blood or 0.1 grams or more of alcohol in 210 liters of that person's breath...."

In the early morning hours of April 27, 1982, Waupaca county sheriff's department officer James R. Kneisler responded to a report of an accident. When he arrived at the scene of the accident, emergency medical personnel were already administering medical care to Rickie Kempf, who later died, and the defendant, David K. Osman (Osman). Both had been thrown from the car as a result of the collision. Officer Kneisler first approached Kempf, who appeared unresponsive and very seriously injured. Officer Kneisler then approached Osman and identified himself as an officer.

While Osman was receiving medical attention, the officer asked him if anyone else had been in the car at the time of the crash. Osman replied that only he and Kempf had been in the car. Kneisler then asked Osman who had been driving the vehicle. Osman answered, "I was driving the vehicle." No *Miranda* warnings were given. This was the extent of the questioning of Osman, which lasted no more than two minutes. After completing the questioning, officer Kneisler proceeded to clear the accident debris and to examine the accident scene for evidence which might aid in completion of the accident report.

Officer Kneisler stated that the sole purpose of the questioning was to determine if there were any other occupants of the car who might have needed medical attention and also to ascertain who had been driving the vehicle at the time it crashed. This information was required in order to complete the accident report. He stated that at the time he was questioning Osman, he had no reason to believe that any crime had been committed.

Officer Kneisler testified that, during the questioning, Osman was experiencing great physical pain

but that he appeared to be rational. He testified that "[Osman] had no problem understanding my questions and I had no problem understanding his responses."

After completing his on-the-scene investigation, the officer went to the hospital where Osman had been moved and asked him whether he had any recollection of the circumstances of the collision. Osman responded that he did not. It was during this conversation that Kneisler first detected a "very distinct odor of alcoholic beverage" emanating from Osman. Kneisler issued a citation to Osman for operating a motor vehicle under the influence of an intoxicant, and a blood sample was drawn. The blood analysis revealed that Osman's blood alcohol content by weight was 0.172 per cent. A criminal complaint was filed against Osman in May, 1982, charging him with homicide by intoxicated use of a vehicle under sec. 940.09, Stats.

At the motion to suppress hearing, which was held in November, 1982, the court received the testimony of Dr. Robert Peterson, who had treated Osman at the hospital immediately following his removal from the scene of the crash. Peterson stated that during his examination, the defendant was experiencing great pain and at one point lapsed into unconsciousness. However, the doctor testified that while conscious, Osman was coherent and able to answer some questions about the accident and about the pain he was experiencing. Nevertheless, Dr. Peterson testified that he was of the opinion that, based on the nature of Osman's injuries combined with his elevated blood alcohol level, the defendant "would have difficulty answering questions with some reliability." In addition, he based his opinion on the fact that Osman had said during his medical examination that he could not move his leg when requested to

do so, yet by the time the doctor finished the evaluation, the defendant was moving his leg. The doctor surmised that Osman's inability to move his leg was based on his inability to respond to the doctor's directive, not to any actual injury to the leg.

The defendant testified that he had no recollection of the circumstances of the accident, the questioning by officer Kneisler, or of receiving emergency medical treatment at the crash site or at the hospital. In addition, he testified at the motion to suppress hearing that he did not drive the vehicle on the night of the crash.

Separate suppression hearings were held, and, in each case, the motion to suppress the statements was granted. In the *Clappes* case, Judge Fleishauer stated that although the police did not engage in abusive tactics or improper questioning, Clappes' admissions nevertheless were involuntary because of the intoxication, great physical pain, and because of the circumstances surrounding the questioning. In the trial court's oral decision granting Clappes' motion to suppress, Judge Fleishauer stated that the circumstances were "fraught with a certain type of pressure and that being primarily the medical condition of the defendant and the attempts to revive him, interspersed with attempts to interrogate him." This statement suggests that the trial court believed that the circumstances provided the requisite pressure or coercive atmosphere.

Similarly, Judge Wiese ruled that Osman's statements, though also not procured via overtly improper or coercive means, were involuntary due to his physical and mental condition at the time the admissions were made, combined with the circumstances of the interrogation. Judge Wiese, in his oral suppression

order, stated that, "I think there is doubt that [defendant] knew what he was saying; and, therefore, it's reasonable to suppress it because it would be improper; and I base it on the defendant's own statement, the doctor's statement, the officer's statement, and the circumstances under which it was taken."

After these cases were consolidated for purposes of appeal, the court of appeals affirmed the respective orders of the trial courts. In affirming the orders, the court found that the admissions were properly suppressed because they were not proved to be voluntary beyond a reasonable doubt. In so holding, the appeals court stated that the "motivating force" behind an involuntary statement can be pain as well as the apprehension associated with that physical pain. It reasoned that individuals who are experincing great physical pain, accompanied by emotional stress and/or intoxication, may reasonably conclude that the elimination of their pain may be dependent upon their cooperation with law enforcement officers seeking to question them. In other words, an individual may respond to police questioning based on the mere appearance of the police officer's power to control the availability of medical care. Because "[f]ear of one's future and control by authority is a powerful inducement to cooperation with the authority," and because of the great pain the defendants were experiencing during the questioning, the court of appeals found that the "only allowable inference" to be drawn from the evidence was that the admissions were involuntary. This subjective flight of fantasy by the court of appeals should have been grounded by the application of common sense.

The appeals court saw no inconsistency between its holding and those cases which have ruled that some police coercion is required in order to justify a finding of involuntariness (e.g., *Procunier v. Atchley*, 400 U.S. 446, 453–54 (1971), *State v. Hunt*, 53 Wis. 2d 734, 740, 193 N.W.2d 858 (1972)). Although the court recognized that the police officers did not employ any physical or overbearing conduct when questioning the defendants, it found that "the use by police of existing circumstances may be the equivalent of overt and forceful pressure or coercion." Thus, the court reasoned that the mere presence of police, their appearance of authority to terminate the provision of medical care, combined with the "perilous surrounding circumstances which threaten the life of a helpless individual," may impermissibly pressure the individual to make a statement against his or her will.

Finally, in its decision, the appeals court stated that it did not regard its holding as a blanket prohibition against police questioning of individuals while they are receiving medical treatment. Rather, because "[m]inor injuries would not create circumstances which undermine the voluntariness of a statement," police may, in those cases where only minor injuries are involved, freely proceed with questioning. Because the phrase "minor injuries" escapes uniform definition, however, the court concluded that a case-by-case inquiry would be necessary to determine voluntariness in any given instance.

Before turning to the case law on the admissibility of evidence obtained during police questioning, a discussion of the applicable standard of review is appropriate. The parties are in dispute on this issue. Both the state and defendant Osman characterize voluntariness as an ultimate constitutional fact,

thereby warranting independent judicial review. Clappes, however, proposes a more deferential approach, arguing that voluntariness is purely a factual issue and, as such, the court should not upset the findings of the trial court unless they are contrary to the great weight and clear preponderance of the evidence.

We find that a different standard of review applies to the findings of the trial court, depending upon how those facts are properly characterized. The standard of review by an appellate court of the trial court's findings of evidentiary or historical fact is that those findings will not be disturbed unless they are contrary to the great weight and clear preponderance of the evidence. *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984). Therefore, disputes as to the factual circumstances surrounding the admission must be resolved in favor of the trial court. *Norwood v. State*, 74 Wis. 2d 343, 364, 246 N.W.2d 801 (1976), *Hunt*, 53 Wis. 2d at 740, *State v. Verhasselt*, 83 Wis. 2d 647, 653, 266 N.W.2d 342 (1978). However, questions of fact involving the application of federal constitutional principles to the facts as found must be independently reviewed by the appellate court. *State v. Hoyt*, 21 Wis. 2d 284, 305–06, 124 N.W.2d 47, 128 N.W.2d 645 (1964), *Miller v. Fenton*, — U.S. —, —, 106 S. Ct. 445, 450 (1985). As such, this court may independently review the facts in these cases to determine whether any constitutional principles have been offended.

We now turn to the rules set out by the courts of this state regarding the admissibility of statements made by a defendant to police officers. In determining whether a confession was voluntarily made, the essen-

tial inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police. *Barrera v. State*, 99 Wis. 2d 269, 291, 298 N.W.2d 820 (1980), *cert. denied* 451 U.S. 972 (1981), *Grennier v. State*, 70 Wis. 2d 204, 211, 234 N.W.2d 316 (1975). The presence or absence of actual coercion or improper police practices is the focus of the inquiry because it is determinative on the issue of whether the inculpatory statement was the product of a "free and unconstrained will, reflecting deliberateness of choice." *Norwood*, 74 Wis. 2d at 364.

In examining whether a confession was rationally and deliberately made, it is important to determine that the defendant was not the "victim of a conspicuously unequal confrontation in which the pressures brought to bear on him by representatives of the state exceed[ed] the defendant's ability to resist." *Hoyt*, 21 Wis. 2d at 308. This determination is made, in turn, by examining the totality of the facts and circumstances surrounding the confession. The ultimate determination of whether a confession is voluntary under the totality of the circumstances standard requires the court to balance the personal characteristics of the defendant against the pressures imposed upon him by police in order to induce him to respond to the questioning. *Grennier*, 70 Wis. 2d at 210.

The relevant personal characteristics of the confessor include his age, his education and intelligence, his physical and emotional condition, and his prior experience with the police. These factors must be balanced against the police pressures and tactics which have been used to induce the admission, such as the length of the interrogation, any delay in arraign-

ment, the general conditions under which the confessions took place, any excessive physical or psychological pressure brought to bear on the declarant, any inducements, threats, methods or strategies utilized by the police to compel a response, and whether the individual was informed of his right to counsel and right against self-incrimination. *Barrera*, 99 Wis. 2d at 291–92; *Norwood*, 74 Wis. 2d at 365; *Grennier*, 70 Wis. 2d at 210–11; *Hoyt*, 21 Wis. 2d at 308–09; *Brown v. State*, 64 Wis. 2d 581, 586–88, 219 N.W.2d 373 (1974).

Both Clappes and Osman concede that some coercion or pressure by the police is a necessary component of an ultimate finding of involuntariness. However, both defendants contend that, given the circumstances surrounding the questioning, only a minimal amount of pressure is required in order to reach a finding of involuntariness, and that the minimum standard has been satisfied here. Specifically, Clappes argues that the combination of factors surrounding the questioning—his poor physical condition at the time, including his intoxication, the use by officers of "leading questions" to elicit a response, and the questions being asked in an "admittedly louder than normal voice"—should necessarily compel the court to find that the statements were not voluntarily obtained. Osman similarly argues that his physical and mental condition at the accident scene "were such that *any* questioning of the defendant by the police at that point in time was equivalent to overt and forceful pressure or coercion." Thus, both defendants are essentially arguing that, even absent any improper coercion or practices by the police at all, the police may nevertheless be precluded from questioning individuals when they are suffering from significant

mental or physical trauma that could arguably prevent them from rationally responding to police questioning. This rendition of the law results in a *per se* prohibition against questioning injured defendants after they are involved in accidents. We decline to adopt such a sweeping interpretation of the concept of involuntariness.

While coercive police activity may arguably take subtle forms, it is stretching the concept of coercion beyond reasonable limits to conclude that the police conduct here was improper in any way. Merely asking an injured and intoxicated defendant questions for a brief period of time—in both cases here, the questioning did not exceed two or three minutes in length—is not the type of improper police activity that constitutes an impermissible, coercive police tactic. As noted by the state in its brief, both defendants were able to respond to the police questioning, and their responses were intelligible to the police who were questioning them. The questioning officers testified that both Clappes and Osman appeared to be coherent, though both were concededly in great pain. The questioning was brief and in both cases was terminated as soon as the police were able to identify the accident victims and the drivers of the cars involved in the respective accidents. No threats or promises or attempts at physical or mental coercion were made.

Nor were the respective officers guilty of utilizing "overbearing inquisitorial techniques." *Grennier*, 70 Wis. 2d at 211. It is conceded that while in the emergency room, Sergeant Morey stood over Clappes and questioned him in a voice louder than normal. It is also conceded that Sergeant Morey had to repeat several questions twice in order to elicit a response. But Morey testified that he addressed Clappes in a

louder than normal tone of voice in order to ensure that Clappes could hear the questions. Clappes did not offer the testimony of any witness who might have contradicted this statement, although half a dozen hospital personnel were in the emergency room at the time. There is nothing in the evidence to suggest that the questioning officers' conduct was improper. Their questioning employed none of the police tactics and stratagems which would be inherently coercive, such as questioning a defendant for excessively long periods of time without breaks for food or rest, *Hoyt*, 21 Wis. 2d at 309, *Hunt*, 53 Wis. 2d at 741; threatening a defendant, with physical violence or otherwise, or making him promises in exchange for his cooperation, *Norwood*, 74 Wis. 2d at 365, *Pontow v. State*, 58 Wis. 2d 135, 138, 205 N.W.2d 775 (1973); or engaging relays of interrogators to question a defendant "relentlessly" or conducting questioning so as to "control and coerce the mind of the defendant," *Phillips v. State*, 29 Wis. 2d 521, 530, 139 N.W.2d 41 (1966). This court refuses to abandon the rule that in order to justify a finding of involuntariness, there must be some affirmative evidence of improper police practices deliberately used to procure a confession.

Our holding is not inconsistent with the totality of the circumstances analysis laid down by this court in previous cases. While a defendant's personal characteristics are relevant, they only become determinative in the voluntariness analysis when there is something against which to balance them. The totality of the circumstances analysis requires a balancing of the personal characteristics of the defendant against the coercive or improper pressures brought to bear on him during the questioning. However, the police employed no inherently coercive tactics. Therefore, because

239

there is no support for the proposition in Wisconsin that the amount of pressure or coerciveness required can decrease to none, a defendant's personal characteristics, while certainly relevant to our analysis, are simply not dispositive of the issue of voluntariness. If the police had employed improper or coercive tactics, our holding might be different. However, under the facts of these cases, and employing the totality of the circumstances analysis, there simply is no foundation for reaching a finding of involuntariness.

Our holding that the mere existence of pain and/or intoxication is insufficient to render a statement involuntary enjoys significant support in other jurisdictions (e.g., *Burwell v. Teets*, 245 F.2d 154, 160–61 (9th Cir. 1957), holding that absent a showing that the defendant did not understand the questions or his responses, the court would not regard his statement as involuntary, despite the fact that he was "sorely wounded, weak and exhausted," *id.* at 161; *Dolan v. Commonwealth*, 468 S.W.2d 277, 281 (Ky. 1971), rejecting defendant's claims that his mental distress, combined with the fact that he was under the influence of sedatives during the questioning, rendered him unable to make a voluntary statement, since he was not "wildly irrational or unaware of what he was saying or doing"; *State v. Williford*, 275 N.C. 575, 580, 169 S.E.2d 851, 855 (1969), finding that the confessor's adverse and painful physical condition is of little consequence unless it is so significant as to completely "destroy" voluntariness or the defendant's understanding of the questions; and *Johnson v. Hall*, 605 F.2d 577, 582 (1st Cir. 1979), ruling that the mere presence of a physical injury was inconclusive, absent physical or verbal threats on the part of the police).

Most significantly, we find that a recent United States Supreme Court decision, *Colorado v. Connelly*, — U.S. —, 107 S. Ct. 515 (1986), directly supports our holding today. *Connelly* properly focused on the "crucial element of police overreaching" in deciding that a murder confession could not be involuntary simply because it was arguably motivated solely by defendant's mental condition.[4] 107 S. Ct. at 520, 522. The court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the fourteenth amendment." 107 S. Ct. at 522.

Thus, this case, like *Connelly*, is easily distinguishable from the decision of the court in *Mincey v. Arizona*, 437 U.S. 385 (1978), where the court did find that statements made by a defendant while receiving medical care for a serious wound were involuntary. However, the defendant in that case unambiguously articulated his wish to be left alone and at two points during the interrogation stated that he wanted to see his attorney. Nevertheless, the questioning officer pressed on until the defendant succumbed to the questioning. Under these circumstances, distinguishable from the facts here, the court found that the defendant was rendered unable to "escape or resist the thrust of [the] interrogation." *Id.* at 399.

Proof of physical pain and/or intoxication should not affect the admissibility of the evidence where there is no proof that the confessor was irrational,

---

[4]The defendant in *Connelly* confessed to a murder and then later told police that the "voice of God" led him to do so. He appeared rational at the time he made the inculpatory statements.

unable to understand the questions or his responses, otherwise incapable of giving a voluntary response, or reluctant to answer the questions posed by the authorities. Where no such proof has been offered, as in the case here, the physical pain or intoxication of the accused is only a factor that the jury may consider in weighing the evidence. *People v. Rhodes*, 119 Ill. App. 3d 1002, 1010, 457 N.E.2d 1300, 1307 (1983), *State v. Wise*, 19 N.J. 59, 91, 115 A.2d 62, 78 (1955), *Williford*, 275 N.C. at 579–80, 169 S.E.2d at 855. Wisconsin is in accord, holding that objections to the admissibility of inculpatory statements based on intoxication largely affect the trustworthiness and credibility of the statements, rather than their admissibility. *Verhasselt*, 83 Wis. 2d at 659.

The real problem with the rule articulated by the appeals court and proposed by the defendants, however, is that its potential adoption by this court could effectively result in the establishment of a *per se* rule of involuntariness (and inadmissibility) whenever an officer questions a defendant who is suffering from serious pain and undergoing medical treatment at the time the questioning takes place. The U.S. Court. of Appeals for the Second Circuit in *United States ex rel. Cronan v. Mancusi*, 444 F.2d 51 (2d Cir. 1971), *cert. denied* 404 U.S. 1003 (1971), expressed this concern as well in a similar case. The court there rejected the defendant's argument that, as a matter of law, his mental and physical condition rendered his confession involuntary. In rejecting this argument, the second circuit stated that "[t]o accept that proposition would be equivalent to a holding that a wound, such as [defendant] suffered, per se renders the victim incapable of exercising reason. This hypothesis is contrary to

common sense and unsupported by cases or other authorities known to us." *Id.* at 54.[5]

The problem with the analysis of the court of appeals and defendants' attorneys is aptly illustrated by the court's discussion in *State v. Parker*, 55 Wis. 2d 131, 197 N.W.2d 742 (1972). *Parker* involved the question of whether a confession obtained from a defendant was involuntarily procured and, therefore, inadmissible. At the time the inculpatory statements were made, the defendant was bleeding from a gunshot wound and was doubled over in what appeared to be great pain while en route to a hospital in an ambulance. Police testified that they believed that defendant was suffering from a serious injury, and statements made by the defendant in the ambulance show that he, too, believed that the wound was serious, if not life-threatening. *Id.* at 136. As it later developed, the defendant had only sustained a minor puncture, rather than a serious wound.

The *Parker* court held that defendant's statement was voluntary and, therefore, admissible because "the motivation for the defendant's statement—his fear of death—came from his own appraisal of his situation and not from any external source [such as police coercion or other improper police practices]." *Id.* at 140. The court further stated, as did the court in *Cronan*, that adopting the defendant's argument for inadmissibility would lead to the inevitable conclusion that "as a matter of law, a confession made by one who thought his death imminent, although subject to

[5]The defendant in *Mancusi* was suffering from a severe gunshot wound in his leg. The confession in that case was procured at the scene of the shooting before medical personnel arrived to tend to defendant's injury.

no coercion, could not constitute a voluntary statement implicating him in the commission of crime." *Id.* The court refused to adopt that conclusion in *Parker*, and we similarly refuse to adopt it now.

For the same reasons that we reject the contention that the sole existence of pain provides an "aura" of coercion sufficient to find the statements involuntary, we also have grave doubts about the applicability here of the appeals court's hypothesis of coercion. The appeals court surmised that each defendant's physical suffering could have caused him to make a statement against his will because he subjectively believed that prompt medical treatment was dependent upon the law enforcement officers' questioning him. The problem with both theories, as shown by the *Parker* case, is that they rely on the confessor's subjective perceptions of the situation, not on any improper external pressures brought to bear by the police. We find the absence of actual coercion to be dispositive in this case. *See, Connelly,* 107 S. Ct. at 521.

Both the court of appeals in its opinion and the attorneys for Clappes and Osman state that under their proposed analysis, police would not in fact be totally precluded from questioning an injured defendant. They argue instead that police could continue to question injured defendants when they are suffering from only "minor" injuries. There are numerous problems with instituting a rule which creates a distinction between serious injuries and merely minor ones.

The essential problem with the serious injury/minor injury distinction is that it is, for all practical purposes, highly unworkable. Who is to make the ultimate determination that an individual is

244

suffering from only a minor injury? Is it, as the *Parker* case stated, to be left to the individual defendant's own appraisal of his or her mental or physical state? Or is the determination to be made by police? If so, what makes them qualified to "diagnose" one injury as serious and another as merely minor? Furthermore, what is the definition of a "minor" injury? An individual may experience excruciating pain but only suffer from a superficial injury. The converse may also be true. The court of appeals has adopted, and on appeal defense counsel have proposed, a rule that is simply unworkable in its day-to-day application. As such, we refuse to adopt this dichotomy and continue to adhere to the general rule that involuntariness is not to be measured solely by the presence or absence of pain, whether minor or major, but rather should depend upon the presence or absence of actual coercive, improper police practices designed to overcome the resistance of a defendant.

Since we find that the officers in these cases employed no inherently coercive or improper tactics in obtaining the statements at issue, we hold that the appeals court erred in affirming the trial courts' suppression orders.

*By the Court.*—The decision of the court of appeals is reversed, and the causes are remanded to the respective circuit courts for further proceedings consistent with this opinion.

HEFFERNAN, CHIEF JUSTICE (*concurring*). I believe that Clappes' and Osman's confessions were involuntary. I write separately to voice my concern that the majority has incorrectly, or at least inconsis-

tently, articulated the test for voluntariness of a confession. *See,* majority opinion at pages 236, 245. In Wisconsin, the test for voluntariness of a confession has heretofore required a determination that the confession was voluntary under the totality of the circumstances. *See, Turner v. State,* 76 Wis. 2d 1, 18, 250 N.W.2d 706 (1977). This is to be determined by "a very careful balancing of the personal characteristics of the confessor with the pressures to which he was subjected in order to induce his statements." *State v. Wallace,* 59 Wis. 2d 66, 81, 207 N.W.2d 855 (1973). Thus, the majority incorrectly states the test for voluntariness when it notes that voluntariness "depend[s] upon the presence or absence of actual coercive, or improper police practices...." Majority opinion at page 245.

I do not, however, conclude that a confession is necessarily inadmissible because the confession was not voluntary. What the majority attempts to say is that the confession was not coerced by police action. Hence, under *Colorado v. Connelly,* — U.S. — (December 10, 1986), it was admissible; but for this court or the United States Supreme Court to continue to use the term, "voluntary," as a test for the admission of a confession is inappropriate if the test is police coercion simpliciter. The question of admissibility of a confession under our *Goodchild* proceeding *(State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965)) will now be, by a showing, beyond a reasonable doubt, of the absence of state compulsion, rather than the proof of voluntariness. Voluntariness, however, continues to be an important factor to be raised at trial, because a confession that is "admissible" because not coerced or compelled by the state may

nevertheless be so unreliable because involuntary that a jury could refuse to give it credence.

While I concur in the result, it is clear that in its terminology the majority, like the United States Supreme Court, if not confusing apples and oranges, is confusing oranges and tangerines. What the court should acknowledge is that the confession, though involuntary, is nevertheless admissible because police coercion did not contribute in any way to its "involuntariness." *Colorado v. Connelly*, — U.S. —, concurring opinion of Stevens, J.

Under the majority's opinion, voluntariness is no longer the touchstone of admissibility. Nevertheless, I am of the opinion that the state can take such inappropriate advantage of a situation, not of its own creation, that nonaction by the police could be deemed coercive. From the facts of record, I do not believe that situation is present here.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). A confession is admissible if the court determines that the confession was voluntary under the totality of the circumstances. The state has the burden to prove the voluntariness of a defendant's statement beyond a reasonable doubt. I agree with the courts below. The state did not carry its' burden.

The word *voluntariness* is a convenient shorthand for describing a complex of values which underlie a decision to bar or admit a confession. *State v. Woods*, 117 Wis. 2d 701, 741 n.1, 345 N.W.2d 457 (Abrahamson, J., dissenting) (1984), *writ of habeas corpus, granted*, 605 F. Supp. 890 (E.D. Wis. 1985), aff'd, 794 F.2d 293 (7th Cir. 1986). Professors LaFave and Israel conclude that three values underlie the Supreme Court's decisions:

Confessions will be barred if (1) the practices used to obtain them make their reliability doubtful; (2) the police use offensive practices to obtain them, even if reliability is not in question; and (3) circumstances significantly impair the defendant's free choice, even if the police do not resort to offensive practices. 1 LaFave and Israel, Criminal Procedure, sec. 6.2 (b), pp. 441–444 (1984).

While the majority seems to say that a confession is per se voluntary if police tactics are not inherently coercive, the majority does not tell us how to determine whether the police conduct is inherently coercive. Courts have not had an easy time specifying what police conduct is inherently coercive.* That is the value of the totality of the circumstances test—it recognizes that police conduct may be coercive under some circumstances, but not under others. Police conduct cannot be dismissed as noncoercive without looking at all surrounding circumstances.

The circuit courts conducted an evidentiary hearing, heard the witnesses and reviewed the medical records. The court of appeals reviewed the records and affirmed the circuit courts. Both the circuit courts and

---

* The majority cites *Colorado v. Connelly*, — U.S. — (1986), as directly supporting its holding. The facts of *Connelly*, however, are very different from those in this case. In *Connelly*, the defendant walked up to a police officer and confessed to a murder. The police officers apparently were wary of the defendant and his confession. Police questioning came after the initial volunteered confession and after Miranda rights were given. The defendant insisted that he understood his rights and spoke willingly to the police on several occasions. In this case the police officers approached the defendants and questioned them, without Miranda warnings, when they were in pain and disoriented.

the court of appeals concluded that the state had not carried its burden of proof and that the statements should be suppressed because they were not voluntarily given under the circumstances of these cases. As Judge Beilfuss, writing for the court of appeals, stated: "The mere presence of police, their appearance of authority, and perilous surrounding circumstances which threaten the life of a helpless individual—all of these in conjunction may pressure the individual and force a statement. The police may not apply the pressure; but in appearance they may still control the means of its release." Majority opinion at page 232.

I would affirm the decisions of the circuit courts and court of appeals. I am authorized to state that JUSTICE WILLIAM A. BABLITCH joins in this dissent.