STATE of Wisconsin, Plaintiff-Respondent,

v.

Alan P. SCHAMBOW, Defendant-Appellant.†

Court of Appeals

*No. 92–1769–CR. Submitted on briefs December 18, 1992.—Decided April 14, 1993.*

(Also reported in 500 N.W.2d 362.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James Bolgert* of *Hayes, Neumann, Humke, Moir & Bolgert, S.C.* of Sheboygan.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Michael R. Klos*, assistant attorney general.

Before Brown, Anderson and Snyder, JJ.

SNYDER, J. Alan P. Schambow was convicted of first-degree intentional homicide and first-degree sexual assault, contrary to secs. 940.01(1) and 940.225(1)(a), Stats. On appeal, Schambow argues the following: (1) statements taken by police while Schambow was in the hospital were obtained in violation of his constitutional rights under *Miranda v.*

*Arizona*, 384 U.S. 436 (1966); (2) the trial court improperly instructed the jury regarding the sexual assault charge; (3) he was denied effective assistance of counsel at trial; and (4) sec. 973.014, Stats., the parole eligibility statute, is unconstitutional. We disagree with Schambow's arguments and affirm the judgment of conviction and order denying postconviction relief.

On April 8, 1990, Christine A. Schambow was found beaten to death in the Eldorado Marsh State Wildlife Area in Fond du Lac county, Wisconsin. Police discovered Alan Schambow approximately two hundred fifty feet from Christine, suffering from ingestion of poisonous fluid. Given the fact that Alan testified to numerous versions of what occurred that day, the exact chain of events leading to Christine's death is in question.

Schambow was taken to the hospital and questioned by detectives of the Fond du Lac County Sheriff's Department. On June 1, 1990, after all of the physical evidence was reviewed, Schambow was arrested and charged with first-degree intentional homicide and first-degree sexual assault. Schambow was found guilty by a jury and convicted on both charges. He appeals the convictions and the trial court's order denying postconviction relief. We will discuss other relevant facts as we discuss each issue.

## STATEMENTS IN HOSPITAL

On April 8, 1990, shortly after Schambow had received initial treatment in the hospital, Detective William Flood interviewed Schambow for approximately twenty minutes. Schambow told Flood that he and Christine had become separated during a hike in the marsh and he was attacked and forced to drink

something. Flood did not give Schambow *Miranda* warnings at that time because he was unsure whether or not Schambow was a suspect or a victim.

On April 9, Detective Flood returned with Detective Steven Hardgrove to further question Schambow. The detectives told Schambow that he did not have to speak with them and that he could speak with an attorney before questioning. Schambow stated that he understood and proceeded with the interview. The detectives interviewed him for forty-five minutes, until Schambow got emotional upon being informed that Christine was dead. At one point during the interview, an investigator with the state public defender's office arrived but was denied admittance into Schambow's room.

On appeal, Schambow objects to the statements taken by police at the hospital on April 8 and 9 because he was not given his full *Miranda* warnings prior to questioning and the statements were not voluntarily given. It is undisputed that at no time during either interview did police give Schambow his full *Miranda* warnings.

The first issue regarding the statements taken by the police at the hospital is whether police were required to give the *Miranda* warnings before questioning Schambow. *Miranda* warnings are required before questioning where "an individual is taken into custody or otherwise deprived of his freedom by the authorities." *Miranda*, 384 U.S. at 478. Since the facts are undisputed, whether the defendant was in custody or otherwise deprived of his freedom within the meaning of *Miranda* presents a question of law which we review independently of the trial court. *State v. Clap-*

*pes*, 117 Wis. 2d 277, 280, 344 N.W.2d 141, 143 (1984) (*Clappes I*).

Schambow argues that, while he was not formally under arrest, his physical circumstances and the officers' conduct indicate that he was in custody and therefore should have been given *Miranda* warnings. He points to the fact that he was confined in the hospital and could not leave when the officers came to question him. He further argues that the police essentially took advantage of the situation by conducting lengthy questioning sessions which amounted to interrogation, and by controlling him when they denied access to the investigator from the public defender's office. We disagree.

The Wisconsin Supreme Court has held that the conditions of custody or otherwise deprivation of freedom requiring *Miranda* warnings are those caused or created by the authorities. *Clappes I*, 117 Wis. 2d at 285, 344 N.W.2d at 146. Summarizing the questioning by police at the hospital, the court stated:

> In the case under consideration, the defendant at the time of questioning was not under arrest; the officers asked consent of the doctors to question him. There were up to seven medical persons present; there was no evidence of trickery or pressure applied to the defendant. The defendant was completely conscious and gave detailed information about his deceased passengers.

*Id.* at 286, 344 N.W.2d at 146. The court also cited the majority view that questioning in hospitals is not custodial when the suspect is not under formal arrest. *Id.*

■

Like in *Clappes I*, the police in this case received permission from the medical staff before questioning. A nurse was present in the room during both questioning

sessions. There is no evidence that Schambow was subjected to threats or coercive tactics by the police. The police limited the time of each interview and stopped after Schambow became emotional upon being told of his wife's death. The limit on Schambow's freedom of action was not caused or created by the authorities. He was in the hospital being treated for ingestion of toxic chemicals. Schambow was not under arrest and was not under police guard. Accordingly, we conclude that there was no custodial questioning which required *Miranda* warnings.

■

The fact that police denied access to the representative from the public defender's office does not indicate Schambow was in custody. The police specifically told Schambow that he could speak to a lawyer before answering any questions. Schambow understood and declined to do so. Therefore, the public defender was an uninvited visitor with no authority to be present during questioning.

The second issue regarding the statements taken in the hospital is whether such statements were voluntarily given. To support his argument that his statements to police were not voluntary, Schambow relies on the fact that he could not leave the hospital, he was being treated with drugs, and was groggy, in pain, and moaned at various points during the interview. He argues that given the recent traumatic events and his physical condition, his choice whether or not to make a statement was impaired.

■

In order to justify a finding of involuntariness, there must be some affirmative evidence of improper police procedures deliberately used to procure a confession. *See State v. Clappes*, 136 Wis. 2d 222, 235-36, 401

N.W.2d 759, 765 (1987) (*Clappes II*). The ultimate determination of voluntariness requires balancing of the personal characteristics of the defendant against the coercive or improper pressures brought to bear on him during the questioning. *Id.* at 236, 401 N.W.2d at 766. If police do not employ coercive tactics, the fact that a defendant is undergoing medical treatment or experiencing pain is not determinative on the issue of voluntariness. *See id.* at 240–41, 401 N.W.2d at 767–68.

There is nothing in the evidence to suggest that the questioning officers' conduct was improper. Before entering Schambow's room, the detectives consulted with the attending nurse and physician to make sure that Schambow was alert and able to talk to them. In both cases the questioning was not for excessively long periods of time. No threats, promises or attempts at physical or mental coercion were made. Further, there is no evidence that Schambow was "unable to understand the questions or his responses, otherwise incapable of giving a voluntary response, or reluctant to answer the questions posed by the authorities." *Id.* at 242, 401 N.W.2d at 768. Under the totality of the circumstances, we cannot conclude that the statements given by Schambow were made involuntarily.

## JURY INSTRUCTION

Schambow alleges that the trial court erroneously instructed the jury regarding the elements necessary for conviction of first-degree sexual assault under sec. 940.225(1)(a), Stats. The trial court initially instructed the jury using the standard instruction for first-degree sexual assault, Wis J I—Criminal 1200. Wis J I—Criminal 1200 instructs the jury that in order to find a defendant guilty of sec. 940.225(1)(a), the state

must prove beyond a reasonable doubt that the defendant had sexual contact or intercourse with the victim, the victim did not consent, and the defendant caused great bodily harm to the victim.

During its deliberations, the jury requested a clarification of the jury instruction. The jury specifically asked the trial court: "When considering the charge of 1st degree sexual assault, the 3rd element requires that the defendant caused great bodily harm. Do we consider only the ¼" x ½" cut to the vagina or do we consider injuries occurred [sic] earlier i.e. head injuries?" The trial court, over objections by Schambow's counsel, reinstructed the jury as follows:

> I would add to the instruction that you have, that being Instruction 1200 in the set of instructions that I have given to you, the following information: It is sufficient if great bodily harm was caused by the defendant during the course of conduct that immediately preceded or followed the act of nonconsensual intercourse.

Schambow does not argue on appeal that there was insufficient evidence to show nonconsensual sexual contact and great bodily harm. Instead, Schambow argues that the trial court's supplemental instruction was erroneous because the plain language of sec. 940.225, Stats., suggests that the great bodily harm must be *caused by* the nonconsensual sexual contact or intercourse. Consequently, he argues that the supplemental instruction had the effect of allowing the jury to convict him without a unanimous finding that the injury caused by the sexual contact, the cut to the vagina, was great bodily harm.

The question of whether the sexual act itself must cause great bodily harm in order to constitute a violation under sec. 940.225(1)(a), Stats., involves statutory interpretation. The interpretation of a statute and the application of a statute to a set of facts present questions of law which we review independently of the trial court. *L & W Constr. Co. v. Wisconsin Dep't of Revenue*, 149 Wis. 2d 684, 688, 439 N.W.2d 619, 620 (Ct. App. 1989). However, it is important to emphasize that the question of the existence of great bodily harm is an issue of fact exclusively for the jury to decide. *Flores v. State*, 76 Wis. 2d 50, 59, 250 N.W.2d 720, 724 (1977), *overruled on other grounds*, 123 Wis. 2d 1, 365 N.W.2d 7 (1985).

In construing sec. 940.225(1)(a), Stats., we are to give effect to the intent of the legislature. *See L & W Constr. Co.*, 149 Wis. 2d at 689, 439 N.W.2d at 620. We must ascertain that intent by first looking to the language of the statute itself and giving the language its ordinary and accepted meaning. *Id.*

We conclude that sec. 940.225(1)(a), Stats., is clear and unambiguous. The three necessary elements are: (1) sexual contact or intercourse with another person; (2) without consent of that person; *and* (3) pregnancy or great bodily harm. Contrary to Schambow's assertions, the plain language of sec. 940.225(1)(a) does not provide that the defendant cause great bodily harm through or by the act of nonconsensual sexual contact or intercourse. Rather, the third element requiring that the defendant cause great bodily harm is a separate and distinct element of the crime, and the sexual act itself need not cause the great bodily harm.

Schambow's interpretation essentially creates an additional element to the crime, namely, that the victim's great bodily harm must be the result of the defendant's sexual contact. As defined by sec. 940.225(5), Stats., "sexual contact" and "sexual intercourse" often may not involve violent behavior which would result in great bodily harm.[1] A statute should be construed to avoid an unreasonable or absurd result. *State v. Morse*, 126 Wis. 2d 1, 4, 374 N.W.2d 388, 390 (Ct. App. 1985). Limiting first-degree sexual assault to those instances in which the sexual contact or intercourse does result in great bodily harm is unreasonable and contrary to the plain meaning of the statute.

■

Our conclusion is further bolstered by the following comments appearing after Wis J I—Criminal 1200, which the trial court relied on:

---

[1] Section 940.225(5), Stats., provides in part:

(5) DEFINITIONS. In this section:

. . . .

(b) "Sexual contact" means any intentional touching by the complainant or defendant, either directly or through clothing by the use of any body part or object, of the complainant's or defendant's intimate parts if that intentional touching is either for the purpose of sexually degrading; or for the purpose of sexually humiliating the complainant or sexually arousing or gratifying the defendant or if the touching contains the elements of actual or attempted battery under s. 940.19(1).

(c) "Sexual intercourse" includes the meaning assigned under s. 939.22(36) as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. . . .

> 7. In the Committee's judgment, if the act of intercourse was without consent, the act itself need not cause the great bodily harm. It is sufficient if great bodily harm was caused by the defendant during the course of conduct that immediately preceded or followed the act of nonconsensual intercourse.

Although these comments are not binding precedent on this court, we generally view the work of the Criminal Jury Instructions Committee as persuasive. *State v. O'Neil*, 141 Wis. 2d 535, 541 n.1, 416 N.W.2d 77, 80 (Ct. App. 1987). We believe this comment is an accurate statement of the law, and therefore adopt it as such.

Regarding the trial court's decision to reinstruct the jury, it is well established that a trial judge may exercise wide discretion in issuing jury instructions based on the facts and circumstances of the case. *State v. Vick*, 104 Wis. 2d 678, 690, 312 N.W.2d 489, 495 (1981). "This discretion extends to both choice of language and emphasis. A trial judge should exercise discretion in order to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence." *Id.* (citations omitted).

We conclude that the trial court properly instructed the jury on the meaning of the statute. The supplemental instruction given by the trial court accurately reflects the proper scope of sec. 940.225, Stats., without invading upon the jury's function as factfinder regarding the existence of great bodily harm. Accordingly, we find no error or misuse of discretion.

## INEFFECTIVE COUNSEL

At trial, Schambow presented contradictory stories regarding his wife's death. On direct examination,

his testimony was comprised of a self-defense version of the facts. He testified that on the day in question he had met his wife at the marsh to discuss their pending divorce but that they became very angry with each other in the process. As he walked to his car, he noticed that Christine had pulled out a tire iron and started walking towards him. According to Schambow, she then raised the tire iron, swung, and hit him in the neck. Schambow grabbed the tire iron, lost control, and beat her to death. He then dragged her body and pulled down her pantyhose to make it appear as though she had been attacked and sexually assaulted. Not wanting to live after that, he consumed the contents of a can of cleaning fluid. Upon survival, he decided to tell police that both he and his wife had been attacked by a third party.

The following day, Schambow told the trial court *in camera* that he had been forced to testify against himself under duress and in doing so perjured himself. However, he would not identify the source of the "duress." Schambow's trial attorneys, Mary A. Wolfe and John Kuech, requested to withdraw since Schambow's comments implied that they had been the cause of the duress. Since the trial was in progress and Schambow wanted to continue with his appointed counsel, the trial court denied the request and proceeded with Schambow's testimony. Schambow then testified that he did not tell the truth on the stand the day before, and, in fact, he had no recollection of any relevant facts from the time he arrived at the marsh until he was being assisted by rescue workers.

Schambow argues that his trial counsel were deficient because they: (1) erroneously advised him to take the stand; (2) inadequately prepared him for testimony; (3) failed to raise the issue of his competence to

stand trial; and (4) failed to support him in pursuing his original version of the case and instead suggested the self-defense theory, encouraging him to admit to acts of past marital violence that were not true.

The two elements necessary to prove ineffective assistance of counsel are deficient performance by counsel and prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The test for deficient performance is whether counsel's assistance was reasonable under the facts of the particular case, viewed as of the time of counsel's conduct. *State v. Pitsch*, 124 Wis. 2d 628, 636–37, 369 N.W.2d 711, 716 (1985). Under the second component of the test, the question is whether counsel's errors were so serious that the defendant was deprived of a fair trial and a reliable trial outcome. *Id.* at 640–41, 369 N.W.2d at 718. The trial court's findings of fact regarding what happened will not be overturned unless clearly erroneous. *Id.* at 634, 369 N.W.2d at 714–15. However, the ultimate determinations of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently. *Id.* at 634, 369 N.W.2d at 715.

The primary conduct at issue here is Schambow's explanation of the events surrounding his wife's death and counsels' role in developing it. After hearing testimony from Schambow and his two trial attorneys, the court made several findings of fact regarding what happened. The court found that Schambow was not a credible witness, that trial counsel did not direct him to testify to a version of his wife's death that was not true or testify untruthfully about other marital violence, and that he was adequately advised by trial counsel regarding the decision whether or not to testify. Based

upon our independent review of the evidence, we cannot conclude that these findings are clearly erroneous.

For whatever reason, Schambow decided to change his story on three different occasions. First, he told counsel and police that a third party attacked his wife and forced him to drink the cleaning fluid. At trial, he initially testified that he acted in self-defense, but the next day changed his story again and testified that he blacked out and had no memory of what happened on the day in question. Schambow argues that his testimony had a significant effect on the verdict and that he would have been better off not testifying at all as opposed to changing his story in the middle of trial. While this is undoubtedly true, it was his decision to testify and he cannot now lay the adverse consequences on his attorneys.

Accordingly, we conclude that Schambow has failed to show that his trial counsels' representation was deficient such that he was denied the right to effective assistance of counsel or that any errors of trial counsel were so serious as to deprive him of a fair trial.

## PAROLE ELIGIBILITY

At sentencing, the trial court imposed a mandatory life sentence and established parole eligibility at fifty years in accordance with sec. 973.014, Stats. Section 973.014 permits a trial court to set a defendant's parole eligibility date at a time later than the prescribed parole eligibility of twenty years when imposing the statutorily mandated life sentence for a Class A felony.

Schambow urges this court to find sec. 973.014, Stats., unconstitutional.[2] Our supreme court, however, has recently ruled that sec. 973.014 is constitutional in all respects.[3] *See State v. Borrell*, 167 Wis. 2d 749, 759, 482 N.W.2d 883, 886 (1992). Since we are bound by the decisions and clear precedent of the Wisconsin Supreme Court, we cannot rule to the contrary. *See State v. Lossman*, 118 Wis. 2d 526, 533, 348 N.W.2d 159, 163 (1984).

*By the Court.*—Judgment and order affirmed.

---

[2] Schambow made similar arguments to the trial court in his motion for postconviction relief and incorporates them in his brief to this court by reference.

[3] Schambow concedes the supreme court's ruling in *State v. Borrell*, 167 Wis. 2d 749, 759, 482 N.W.2d 883, 886 (1992), that sec. 973.014, Stats., is constitutional, but raises the issue to preserve his right to ask the supreme court for reconsideration upon appeal.