STATE of Wisconsin, Plaintiff-Appellant,

v.

Leng K. XIONG, Defendant-Respondent.

Court of Appeals

*No. 93–0182–CR. Submitted on briefs June 11, 1993.—Decided July 28, 1993.*

(Also reported in 504 N.W.2d 428.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sharon Ruhly*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Glenn L. Cushing*, assistant state public defender.

Before Nettesheim, P.J., Brown and Anderson, JJ.

BROWN, J.   The state brings this interlocutory appeal from the trial court's order suppressing evidence found during a warrantless consent search. The issue is whether Leng K. Xiong's wife, Mai Lee, voluntarily consented to a police search of the Xiongs' residence. We conclude that Mai Lee's consent was voluntary under the totality of the circumstances, and we reverse the trial court's order.

On the night of January 23, 1992, the police found Moua Xiong dead in a van that was parked on a city street. An autopsy determined that multiple stab wounds caused Moua's death. The next day, the police took an interpreter to Leng's home. Both Leng and Mai Lee identified Moua from a photograph. Moua was Leng's cousin.

Over the next few days, the police questioned Leng and Mai Lee several times about Moua's death. The record indicates that an interpreter was used on these

occasions. At about 9:00 p.m. on January 25, they transported Leng and Mai Lee to the police station for questioning. The officers questioned Mai Lee alone in a small room for about one hour. An interpreter was used here. They made no promises or threats, did not deny her food or water, and did not harm her in any way. Mai Lee did not indicate at any time that she was unwilling to talk to the officers.

Near the end of the interview, the officers asked, through the interpreter, if Mai Lee would allow them to search her home. She verbally agreed to the search. After obtaining her verbal agreement, the officers asked her to sign a standard consent to search form. The Hmong interpreter translated the form to Mai Lee and attempted to explain its provisions.

An officer then asked the interpreter to reiterate his explanation so that the officer could be certain that Mai Lee understood the form's contents. When he was satisfied that Mai Lee understood her consent, the officer asked her to sign the form. After obtaining her signature, the officers went to the Xiong residence and searched it. They seized four knives and a pair of boots that had a dark red substance on them.

At the hearing on the motion to suppress, the interpreter testified that he first read the form in English, translated it into Hmong, and then repeated it twice in Hmong for Mai Lee. He also testified that the Hmong language does not have words for "constitution" or "warrant." He translated "constitutional right" as "some sort of law" or "you have your own right to say or to do." When asked how he translated "warrant," the interpreter said, "This is something that is not direct translation. Then I have to explain this would allow so-and-so to do something. That means you allow to do it; you agree."

Leng brought a motion to suppress the evidence obtained in the consent search on the ground that Mai Lee's consent was involuntary. The trial court granted the motion on the ground that the interpreter's translation of the consent form inaccurately defined "warrant." The court also stated:

> In the course of his translation from the detectives to Mrs. Xiong, Mr. Yang did not give her any indication that she would have the right to limit the scope of the search. A search pursuant to consent may not be more intensive than was contemplated by the person giving the consent. Since Vue Yang had no idea what the officers were going to search for when the search was to commence, it is clear that he could not have relayed this information to Mrs. Xiong.
> The burden is on the State to prove that this consent was given voluntarily, intelligently, and freely. In this instance the Court is not satisfied that Mrs. Xiong had sufficient information to give a knowing consent for the search of her home.

The state appeals from the trial court's order.

■■■■■

We must decide whether Mai Lee's consent was voluntary. We review the trial court's findings of historical facts under the clearly erroneous standard set out in sec. 805.17(2), Stats. *See State v. Michels,* 141 Wis. 2d 81, 90, 414 N.W.2d 311, 314 (Ct. App. 1987). We independently apply constitutional principles to the facts as found to determine whether the standard of voluntariness has been met. *See State v. Clappes,* 136 Wis. 2d 222, 235, 401 N.W.2d 759, 765 (1987). We owe no deference to the trial court in making this constitutional determination. *See State v. Rodgers,* 119 Wis. 2d 102, 107–08, 349 N.W.2d 453, 455 (1984).

The test for voluntariness is whether consent to search was given in the "absence of actual coercive, improper police practices designed to overcome the resistance of a defendant." *Clappes,* 136 Wis. 2d at 245, 401 N.W.2d at 769. We make this determination after looking at the totality of the circumstances. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *Rodgers,* 119 Wis. 2d at 114, 349 N.W.2d at 459. No single criterion should control our decision. *See Schneckloth,* 412 U.S. at 226. The state has the burden of proving voluntary consent by clear and convincing evidence. *Rodgers,* 119 Wis. 2d at 114–15, 349 N.W.2d at 459.

■

In its decision, the trial court relied on the fact that Mai Lee did not have "sufficient information to give a knowing consent for the search of her home." It expressed concern that she did not understand what a warrant was and that her consent was not given "voluntarily, intelligently, and freely." This language indicates that the trial court applied the "knowing and intelligent waiver" standard to determine voluntariness. This was error. The test for waiver of a constitutional right is inapplicable to a consent search. *Schneckloth,* 412 U.S. at 241. The state's burden in a consent search is to show voluntariness, which is different from informed consent. *Rodgers,* 119 Wis. 2d at 110, 349 N.W.2d at 457.

■

However, we will not remand to the trial court with directions to use the correct test and make a new determination. The historical facts have already been determined by the parties. Those facts, such as they are, remain undisputed. The sole issue is the applica-

tion of the constitutional principles to those facts of record. This is a task which we can perform independently of the trial court. We therefore will set forth the correct constitutional principles and apply those principles to the facts.

The state and Leng do not agree about what those constitutional principles are that we must apply. The state appears to argue that there must be affirmative evidence of overt improper police tactics in obtaining Mai Lee's consent. While acknowledging that voluntariness must be determined by considering the totality of the circumstances, it nonetheless contends that "[i]n the absence of any coercive tactics, it is questionable whether a court should even consider the individual characteristics of the person giving consent." It argues that because Leng presented no affirmative evidence of what we would term "conspicuous" police tactics, he failed in his burden and the motion to suppress should have been denied.

Leng concedes that the standard for valid consent is voluntariness rather than the "knowing and intelligent waiver" standard applied in other situations. He also concedes that the officers were not required to inform Mai Lee of her right to refuse consent. However, he appears to argue that conspicuous police tactics are but one factor to consider. *Inconspicuous* tactics must be factored in as well. His view is that Mai Lee consented involuntarily in response to subtly coercive police tactics. In particular, Leng cites his wife's inability to speak or understand English, her lack of knowledge of the American judicial system, and the poor translation of the word "warrant." Leng also contends that the police tactic of removing his wife from her home "late at night" and questioning her alone in a locked area of the police department was coercive.

533

Thus, her consent was involuntary under the totality of the circumstances.

If it is the state's assertion that the absence of obviously coercive police tactics negates the need to consider the characteristics of the person giving his or her consent, we disagree with it. While the state cites four cases purporting to corroborate its view: *Clappes; Michels; Colorado v. Connelly,* 479 U.S. 157 (1986); and *State v. Owens,* 148 Wis. 2d 922, 436 N.W.2d 869 (1989), those cases support a different view. Those cases suggest that police coercion and a defendant's personal characteristics are interdependent concepts. Whether coercion exists is determined by looking at the totality of the circumstances. The more vulnerable a person is because of his or her unique characteristics, the more easily he or she may be coerced by subtle means. The United States Supreme Court wrote: "[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the voluntariness calculus." *Connelly,* 479 U.S. at 164. *Connelly* further cautions that a personal characteristic, such as a person's mental condition, cannot by itself and apart from its relation to official coercion, dispose of the inquiry into constitutional "voluntariness."*Id.*

*Connelly* teaches that overt acts are not the sole criterion of coerciveness. If there is evidence that police are taking subtle advantage of a person's personal characteristics, that may be a form of coercion.

The other cases cited by the state support this view. In *Michels,* this court stated that voluntariness under the totality of the circumstances requires a balancing of the defendant's characteristics against the

"pressures imposed on him or her by the police in order to induce him [or her] to respond to the questioning." *Michels*, 141 Wis. 2d at 91, 414 N.W.2d at 315. *Clappes* requires a similar balancing. The personal characteristics to be considered may include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with police. *Clappes*, 136 Wis. 2d at 236, 401 N.W.2d at 766. These must be balanced against police pressures and tactics used to induce cooperation, the length of the police contact, the general conditions under which the contact occurs, excessive physical or psychological pressure, and inducements, threats or other methods used to compel a response. *See id.* at 236–37, 401 N.W.2d at 766.

Finally, *Owens* does not stand for the proposition that an absence of obvious police coercion should end our inquiry into voluntariness. That opinion relied on language from both *Clappes* and *Michels* for the proposition that " 'improper police practices' must be demonstrated for a finding of involuntariness." *Owens*, 148 Wis. 2d at 935, 436 N.W.2d at 874–75. This statement was made in response to an argument that the defendant's subjective feeling of coercion should be the dispositive factor in a voluntariness determination. *Id.* at 932–35, 436 N.W.2d at 873–75. In the next paragraph, the court reiterated that the totality of the circumstances must be considered when determining voluntariness. *Id.* at 935, 436 N.W.2d at 875.

We conclude that the factors set out in *Clappes* and *Michels* should be applied to determine whether the police engaged in improper tactics to obtain consent to a search. These factors do not comprise an exhaustive list, but are to be used as guidelines for our analysis. Therefore, we specifically reject the state's suggestion

that cultural background is irrelevant to the inquiry. In each of the cases cited by the state, the courts considered the defendants' cultural backgrounds but concluded that they had not been coerced under the totality of the circumstances. In fact, the real issue here, as we see it, is whether the police took advantage of Mai Lee's lack of understanding of the English language and customs to gain consent. Mai Lee can hardly agree to something if she does not understand what is being asked of her.

■■

We now turn to the specific facts of this case. We conclude that Mai Lee's consent was voluntary because she was not coerced under the totality of the circumstances. The fact that Mai Lee is Hmong and neither speaks nor understands English makes her particularly susceptible to improper influences. However, we must balance her language and cultural differences against the tactics used to secure her consent.

In this case, the police made obvious attempts to ensure that Mai Lee understood her actions. They obtained a Hmong interpreter and asked him to reiterate what he had translated for the benefit of the officers. The police did not deprive Mai Lee of food, water or sleep. They did not threaten her or harm her in any way. No weapons were visible at any time during the questioning. Mai Lee gave her consent orally, then signed the consent form after the interpreter translated it. The interpreter testified at the hearing that Mai Lee appeared to understand his explanations. He also testified that she did not appear afraid or uncomfortable.

Leng did not offer any evidence to contradict the state's witnesses. In particular, Leng did not question the interpreter about what it was that he told Mai Lee

during the discussions preceding the production of the consent form. The record is devoid of evidence suggesting that Mai Lee's language and culture were barriers to her understanding that the police wanted to search her home. We acknowledge that she did not receive an adequate definition of "warrant." However, whether she understood that a warrant would be necessary is irrelevant to the constitutional question of voluntariness. Mai Lee's consent did not have to be fully informed; it merely had to be given in an atmosphere free of coercive influences. In the absence of any evidence to the contrary, we hold that the state has satisfied its burden of proving voluntariness.

We stress that our decision rests not upon the fact that the interpretation of the consent form was effective, but upon the fact that the errors made were not central to the constitutional question involved. We agree with the trial court that language barriers make a determination of voluntariness more difficult. It is incumbent upon the police to effectively communicate their objectives when seeking consent to search. Merely providing an interpreter is not enough. The interpretation must convey what is intended to be communicated. Communication is effective only if it clearly and accurately relates all pertinent information to the listener. If effective communication is not provided, then that is a form of coercion. There is no evidence that that is the case here.

*By the Court.*—Order reversed.