STATE of Wisconsin, Plaintiff-Appellant-Cross-Respondent,†

v.

George W. HINDSLEY, Defendant-Respondent-Cross-Appellant.

Court of Appeals

*No. 99–1374–CR. Submitted on briefs March 15, 2000.—Decided May 11, 2000.*

2000 WI App 130

(Also reported in 614 N.W.2d 48.)

†Petition to review dismissed.

359

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Scott Roberts*, assistant district attorney, of Stevens Point.

On behalf of the defendant-respondent-cross-appellant, the cause was submitted on the briefs of *James B. Connell* of *Crooks, Low, Connell & Rottier, S. C.* of Wausau.

Before Dykman, P.J., Vergeront and Deininger, JJ.

¶ 1. VERGERONT, J. The State of Wisconsin appeals from an order of the circuit court suppressing a statement of George Hindsley on the ground that the State did not prove by a preponderance of the evidence that Hindsley, who is deaf, was adequately informed of his *Miranda* rights[1] and knowingly and intelligently waived them. The State contends the trial court erred because its findings of fact are clearly erroneous in that the evidence shows that Hindsley did have an adequate understanding of his *Miranda* rights through an interpreter provided by the City of Stevens Point Police Department and did knowingly and intelligently waive those rights. The State also contends the trial court erred because it required a greater degree of understanding for a valid waiver than the case law requires. Finally, the State asks us to adopt a good faith exception to the requirement that a suspect's waiver of *Miranda* rights be knowing and intelligent when a police department provides a certified interpreter who it believes in good faith can communicate effectively

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

with the suspect. Hindsley cross-appeals, challenging the court's determination that Hindsley's statement was voluntary. Hindsley contends that, even if there is no coercive police conduct, a statement is not voluntary if *Miranda* rights are not effectively communicated to a deaf suspect in the language of the suspect.

¶ 2. We conclude the trial court's findings of fact are not clearly erroneous and the trial court applied the correct legal standard to those facts in concluding that Hindsley did not knowingly and intelligently waive his *Miranda* rights. We do not consider whether the good faith exception proposed by the State should be adopted because that is not an appropriate function for this court. We also conclude that the standard for voluntariness proposed by Hindsley is not supported by the case law, and, based on the trial court's factual findings that the police conduct was not coercive, the court correctly determined the statement was voluntary. We therefore affirm the order of the circuit court.

## BACKGROUND

¶ 3. Hindsley was charged with first-degree intentional homicide arising out of the death of his two-year-old son, George Thunder Hindsley, which occurred when Hindsley was residing with his son at the Salvation Army Hope Center in Stevens Point. The death occurred on January 21 or 22, 1997. Upon the discovery of the child's body, employees of the Salvation Army summoned officers from the Stevens Point Police Department. Sergeant Ronald Carlson, one of the officers who arrived at the Salvation Army, communicated with Hindsley by note writing and testified that it was Hindsley who brought up the subject of his son. Hindsley was taken to the Portage County Law Enforcement Center so that Sergeant James Dowling

of the Stevens Point Police Department could take a statement concerning his son's death.

¶ 4. The police department contacted Elaine Hernandez who agreed to serve as an interpreter for Hindsley. Hernandez had been certified for interpretation by the Registry of Interpreters for the Deaf in August of 1996.[2]

¶ 5. The interview of Hindsley by Sergeant Dowling with Hernandez interpreting lasted two hours and six minutes and was videotaped. At the beginning of the interview Sergeant Dowling read aloud a statement of *Miranda* rights, rephrased them a number of times, answered Hindsley's numerous questions conveyed to him by Hernandez, and showed Hindsley the written statement of *Miranda* rights, which Hernandez ultimately signed.[3] During the remainder of the interview, Sergeant Dowling took a statement conveyed by Hernandez from Hindsley concerning Hindsley's background, the circumstances leading up to his residence at the Salvation Army Hope Center with his son, and the circumstances of his son's death.

¶ 6. After a preliminary examination Hindsley was bound over for trial.[4] He moved to suppress his

[2] Hernandez had first met Hindsley in December 1996 when she interpreted for him at the request of the court at a court hearing in another matter, and met him again earlier in January 1997 to interpret when he met with his attorney on the other matter.

[3] The transcript prepared by the police department of the entire interview is twenty-eight pages; seven concern the *Miranda* warnings.

[4] On that date an Information was filed charging Hindsley with first-degree intentional homicide and bail jumping. According to the State's Motion for Joinder, the basis for the bail jumping charge was that at the time of the death of his son,

statement and a hearing was held on May 29, 1997.[5] Sergeants Carlson and Dowling testified concerning the circumstances of Sergeant Carlson's interview with Hindsley at the Salvation Army Hope Center and Sergeant Dowling's interview of Hindsley at the Law Enforcement Center. Scott Bartelme, a case worker at the Salvation Army, testified that he communicated with Hindsley in "broken English" in writing, and that if Hindsley did not understand, he would write "What mean?" and Bartelme would then rewrite it in another way. Bartelme acknowledged that he did not know what Hindsley did not understand when he wrote "What mean?," that it was time consuming to write and rewrite, and that Hindsley was often confused about the rules; but he felt that he was able to effectively communicate with Hindsley.

¶ 7. Hernandez testified she used sign language with Hindsley, but she could not specifically remember whether she used American Sign Language (ASL) or whether she used transliteration.[6] She had never com-

---

Hindsley was subject to a bond posted in another matter in which he was charged with two counts of battery in violation of WIS. STAT. § 940.19(1) (1997–98) against his sister and against Elizabeth Mulligan, the mother of his son. The State's motion to join the homicide charge and the bail jumping charges was denied.

[5] Hindsley's motion also requested suppression of his statements to Sergeant Carlson while at the Salvation Army office. That portion of the motion was granted and is not an issue on this appeal.

[6] The American Linguists Association has accorded ASL the status of a language. *See* Jeffrey B. Wood, Comment, *Protecting Deaf Suspects' Right to Understand Criminal Proceedings*, 75 J. CRIM. L. & CRIMINOLOGY 166, 166–67 n.3 (1984). Like all languages, ASL varies among different geographic regions, ages, educational levels and socioeconomic backgrounds of the deaf.

municated *Miranda* rights to a deaf person before; however, she felt that she was able to communicate with Hindsley.

¶ 8. Hindsley, who was twenty at the time of this hearing, testified that he had been deaf since he was two. He knows ASL, which he learned primarily at the Wisconsin School for the Deaf in Delavan; he attended that school for approximately three years. He testified that he cannot write English; he writes as he signs, that is, he writes ASL; and he can only read "kids books" in English. According to Hindsley, Hernandez did not use ASL; she sometimes used English, and he did not understand the English, so he did not understand what she was communicating concerning his *Miranda* rights.

¶ 9. The trial court determined there was no coercion by the police and, therefore, Hindsley's statement to Sergeant Dowling was voluntary. It also determined that, although the videotape of the interview by Sergeant Dowling showed some confusion on the part of Hindsley and although Hindsley testified that he did not understand his *Miranda* rights, he did

*See id.* ASL is American only; the deaf in other nations use different sign languages. *See id.*

According to the testimony ASL is not based on English, has a grammar and structure that is not like English, and is more conceptual than English. In contrast, transliteration is a signing system based on English, breaking English words into suffixes, prefixes, and morphemes, and using an English word order structure.

According to Hernandez's testimony, obtaining the Certificate for Interpretation involves taking a message in English and translating it into ASL and translating a message from ASL back to English. The Registry for the Deaf has a separate Certificate for Transliteration, which Hernandez obtained after the interview.

knowingly and intelligently waive them. The court did not rely on the written statement of *Miranda* rights presented to Hindsley during the interview because it found Hindsley's English reading level was not adequate to read that document.

¶ 10. On September 9, 1997, Hindsley entered a plea of guilty to first-degree intentional homicide. Several weeks later, and before sentencing, he obtained new counsel and moved to withdraw his guilty plea. The basis of Hindsley's motion for withdrawal of the plea was that he did not fully understand the rights he was waiving in entering his plea. The trial court held a lengthy evidentiary hearing on this motion, which took place on four different days between February 25, 1998 and June 19, 1998, and subsequently entered an order allowing Hindsley to withdraw his guilty plea. Hindsley then filed another motion for suppression of his statement to Sergeant Dowling. The court informed the parties that it was going to consider all of the evidence from the prior hearings in deciding this motion, and it allowed the parties to present additional evidence, which occurred on April 22 and 23, 1999.

¶ 11. We summarize here the significant evidence presented at the hearings in 1998 and 1999 that is relevant to the suppression motion and was not presented at the hearing on May 29, 1997.[7] Three of Hindsley's teachers from the Wisconsin School for the Deaf in Delavan, one deaf, two hearing, and all fluent in ASL, testified that Hindsley was fluent in ASL. Test

---

[7] We have not summarized the testimony from the individuals who interpreted for Hindsley in meetings with his prior counsel and in court regarding entry of the plea. Their testimony, insofar as it is relevant to the suppression motion, does not add significantly to the testimony we summarize, and is consistent with it.

results showed that he had superior intelligence and in 1993, when Hindsley was about seventeen years old, he read English at a second grade level. Two of the teachers agreed that Hindsley had limited proficiency in English and written communication and that if someone used English in communicating to him he would understand "random words," but would not get the message. The third teacher disagreed, stating that if someone signed in English, he might not get all of it, but "he would get . . . the basis of it," and "he is able to write and read [English] pretty well." Another faculty member (not deaf) who had not been Hindsley's teacher but knew him, testified that she could communicate effectively with him in ASL, but he was not good at reading and writing English.

¶ 12. Several employees from the Salvation Army, the Wisconsin School for the Deaf (not teachers), and an employee in the jail where Hindsley was incarcerated (all hearing and none knowing ASL) gave testimony similar to that of Bartelme: they communicated with Hindsley by writing notes and making signs, his writing was "broken English," and they felt they could communicate effectively with him.

¶ 13. The defense presented two witnesses who had experience and training in interpreting for the deaf in legal proceedings and who had viewed the videotape of the interview with Sergeant Dowling: Tupper Dunbar and Linda Carroll.[8] Both described Hindsley's sign

_____

[8] Dunbar had known Hindsley for two years when Hindsley was attending a program for the deaf in Massachusetts during 1992–94, between Hindsley's two periods of schooling in Delavan. Dunbar is hearing but ASL was his first language because his parents were deaf. Carroll is deaf. She was acquainted with Hindsley when he was in Massachusetts. She prepared an interpretation of Hernandez's signing and Hindsley's signing

language as ASL, with some differences because of his Native American culture and, perhaps, for other reasons.[9] Both agreed that Hernandez was using a form of signing that was English-based and was not ASL, and agreed that her interpreting exhibited a lack of legal training. Dunbar testified that Hernandez was transliterating *Miranda* rights, not interpreting them into ASL. Throughout the interview Hernandez and Hindsley used different ways of indicating pronouns, tense, and time markers, as well as different grammar and syntax.

¶ 14. Both Dunbar and Carroll gave examples of how Hernandez's signing was not understood by Hindsley. For the concept "rights," Hernandez used the sign for "all right" or "okay, " and Hindsley's responses showed he understood the sign as "all right" or "okay."[10] Because of the differences in indicating pronouns, "decide . . . for yourself" and "the choice is yours" were rendered by Hernandez in sign as "decide itself," which in ASL does not convey that the recipient of the message is to take an action or has a choice. To convey the meaning of "remaining silent" and "not speaking" as used in the *Miranda* warnings, Hernandez used the

---

during the segment of the interview on *Miranda* without first reading the written transcript.

[9] The deaf interpreter for Hindsley at the plea withdrawal hearing also testified that Hindsley uses ASL with some Native American sign influence.

[10] Carroll testified that there is no equivalent in ASL for the word "right" in English as used in the *Miranda* warnings, so it is necessary to use other signs to explain that concept in ASL. Hernandez used a sign that was understood by hearing people and college-educated deaf as "rights" as used in *Miranda* warnings, but that is not standardized usage in ASL for that concept.

sign for "using your voice," instead of the sign for "dialogue" or "discourse."

¶ 15. Dunbar and Carroll agreed there was a great deal of variation between what Hindsley was communicating and what Hernandez was verbalizing to Sergeant Dowling. Some examples are: Hernandez interpreted Hindsley's nodding of his head to mean "yes," but in ASL a head nod, by itself, may mean "I understand," "I'm waiting for clarification" or "go ahead," and does not necessarily mean "yes." Hindsley's answer to the question of whether he had any questions was on occasion that he was still confused and needed further clarification, but this did not always get spoken. At no time, Dunbar testified, did Hindsley express that he understood his rights. In Carroll's words, the communication between Hindsley and Hernandez was "disconnected."[11]

¶ 16. Hernandez testified at both the plea withdrawal hearing and at the second suppression hearing. At the former she testified that when interpreting at the interview she used components of ASL, but was not qualified to say if Hindsley used ASL or another form of sign language, although she felt that she did understand him. Interpreting *Miranda* rights for the deaf was one of the hardest things to do, and she had received legal training since the interview. She acknowledged she might have interpreted Hindsley's nods as being affirmative "yes's." She believed she did not make clear when, in interpreting Hindsley's nods, her spoken "Uh-huh" meant "yes, I understand" and when it meant "yes, come on and talk some more."

---

[11] Another experienced interpreter for the deaf submitted a written report which made many of the same points Dunbar and Carroll made.

¶ 17. Before testifying at the second suppression hearing, Hernandez viewed the videotape of the interview and read the reports of Dunbar and Carroll. She agreed with them that she used transliteration and did not actually interpret what Sergeant Dowling was saying into ASL for Hindsley. Based on the education she has since received, she agreed that transliteration is not the way to communicate *Miranda* rights to most deaf individuals. She stated that transliteration would convey the message to individuals skilled in English, but she did not have an opinion as to whether Hindsley understood what she was trying to communicate concerning his *Miranda* rights. She could not, however, say that he had no understanding.

¶ 18. At the close of the testimony on April 23, 1999, the trial court ruled that Hindsley's statement to Sergeant Dowling was voluntary, but Hindsley had not knowingly and intelligently waived his *Miranda* rights. In support of its conclusion that the statement was voluntary, the court made these findings. The law enforcement personnel went to great effort to accommodate Hindsley by obtaining an interpreter, insuring he was comfortable, giving him courtesy and respect and not abusing him, and there was no coercive police activity. Sergeant Dowling had obtained an interpreter who was certified as an interpreter for the deaf and, therefore, had a basis to believe that he was providing an appropriate interpretation service. From the first time Hindsley saw a police officer at the Salvation Army Hope Center, he attempted to communicate what happened and wanted to do so, and the officers tried to prevent him from doing so until they had elicited from him an understanding of his rights.

¶ 19. With respect to the Miranda warnings, the court referred to *State v. Santiago*, 206 Wis. 2d 3, 556

N.W.2d 687 (1996), as establishing the requirement that law enforcement personnel must obtain a translator who speaks the language of the suspect in order to fulfill the requirements of the *Miranda* warning. The court found that ASL was Hindsley's primary language, he could effectively communicate in ASL, and when he used English, his ability to effectively communicate "dropped dramatically." The court found Hernandez did have the ability to interpret using ASL, but in interpreting for Hindsley she used transliteration, a method of signing English, instead of ASL. The court observed that Hernandez had not explained why she had used transliteration, other than that she was trying to be "as literal as she could"; the court stated that perhaps the reason was that, without intending to do so, Sergeant Dowling had encouraged her to be more literal in an effort to make the interpretation more accurate.[12] Whatever the reason for Hernandez's use of transliteration, the court found, the language she used was not Hindsley's language.

¶ 20. The court referred to the evidence that Hindsley does use English and can communicate "beyond ASL, that he involves himself with other people using English; that he write notes; that he can obtain most of his daily needs and necessities in that way; that he can communicate at least to some degree about more subtle issues than that." However, the court found that none of that evidence suggested he communicated in detail about intangible ideas in English. The court concluded the State had not demonstrated that Hindsley had a competency level in the English language sufficient to enable him to under-

---

[12] The court was referring to Sergeant Dowling's testimony that just before the interview began, he asked Hernandez to stay "as close to an exact interpretation as possible."

stand a discussion concerning a waiver of his *Miranda* rights and, therefore, had not demonstrated by a preponderance of the evidence that Hindsley understood those rights and knowingly waived them.

## DISCUSSION

*Appeal—Knowing and Intelligent Waiver*

¶ 21. When the State seeks to admit statements made during custodial questioning, it must make two separate showings: it must establish that the suspect was informed of his *Miranda* rights, understood them, and knowingly and intelligently waived them; and it must establish that the statement was voluntary. *See State v. Lee*, 175 Wis. 2d 348, 359, 499 N.W.2d 250 (Ct. App. 1993). The State's burden of persuasion is that of preponderance of the evidence. *See Santiago*, 206 Wis. 2d at 29. The appeal raises the question whether the State succeeded in establishing that Hindsley understood his *Miranda* rights and knowingly and intelligently waived them.

¶ 22. The ultimate question whether the *Miranda* warnings are sufficient and *Miranda* rights have been knowingly and intelligently waived is one of constitutional fact. *See id.* at 18. When reviewing a question of constitutional fact, we employ two standards of review: we review the trial courts findings of historical fact under a deferential standard, reversing them only if they are clearly erroneous; and we review de novo the ultimate question whether the facts as found by the trial court meet the constitutional stan-

dard. *See State v. Martwick*, 2000 WI 5, ¶ 19, 231 Wis. 2d 801, 604 N.W.2d 552.[13]

¶ 23. We consider first the State's argument that the trial court's findings were clearly erroneous, which has several parts. First, the State contends the record does not support the trial court's finding that Hernandez used transliteration rather than ASL when interpreting for Hindsley. The State points to Hernandez's testimony at the first suppression hearing that she was not clear about what method she used. However, after viewing the video, she testified that she used transliteration and that she "did not actually interpret the information in [ASL] to [Hindsley]." Moreover, Carroll and Dunbar also testified that Hernandez did not use ASL but rather used an English-based or English-like signing.[14]

¶ 24. The State emphasizes Hernandez's testimony at the first hearing that she used a sign language she felt Hindsley would understand, but the State ignores the testimony at the later hearing that she did not know what Hindsley understood concerning his

[13] The State may have been suggesting at oral argument that *State v. Santiago*, 206 Wis. 2d 3, 556 N.W.2d 687 (1996), supports the use of a single de novo standard of review on this appeal. However, the court in *Santiago* noted that for purposes of that appeal, there were no disputed facts. *Id.* at 13. Therefore, once the *Santiago* court decided that the question of the sufficiency of the *Miranda* warnings and whether the rights were knowingly and voluntarily waived was a question of constitutional fact, it reviewed de novo whether the undisputed facts met that standard. *Id.* at 27.

[14] The State suggests that transliteration is an alphabetical letter-by-letter finger spelling of English. This is not consistent with the evidence (see footnote 6) but, in any event, the crucial point is that Hernandez in her later testimony acknowledged that she used transliteration rather than interpreting into ASL.

*Miranda* rights. There is no doubt from the record that Hernandez did her best to interpret for Hindsley and, at the time of the interview, she felt she was effectively communicating with him. However, that evidence does not compel a finding that she actually did effectively communicate Hindsley's *Miranda* rights to him, in view of other evidence. Similarly, the evidence that Hernandez understood Hindsley when he was describing his background and other factual circumstances[15] does not prove that Hindsley understood Hernandez's signing concerning his *Miranda* rights.

¶ 25. The State contends the court's findings on Hindsley's use of English and the evidence supporting those findings are inconsistent with its finding that his English was not adequate to understand his *Miranda* rights. Again, we disagree. There was little, if any, testimony that Hindsley had a proficiency level in English sufficient either to read and understand the *Miranda* warnings or to understand an explanation of them in a sign language based on English, and there was much testimony that he did not have that proficiency.

¶ 26. The State points to evidence that ASL was not Hindsley's first language. The evidence indicated that Hindsley learned ASL primarily at school in Delavan and that his first language was another type of sign language—perhaps Native American sign, home or family sign, or a combination thereof. However, that is not inconsistent with the circuit court's finding that, at the time of the interview, ASL was his primary lan-

---

[15] Sergeant Dowling testified that the police department had verified 109 facts related from Hernandez to him, concerning Hindsley's background and events in the time period before his son's death. Hernandez testified she had not known any of this information before the interview.

guage; nor does it tend to prove that he understood Hernandez's signing concerning his *Miranda* rights.

¶ 27. The State also asserts that some of the witnesses upon whose testimony the court relied were biased, because they acknowledged either that they were advocates for the deaf, or for Native American deaf culture or had known Hindsley. However, all of this information was thoroughly explored by the prosecutor on cross-examination, and the court had the opportunity to weigh all the factors that went to the credibility, reliability and bias of the witnesses. It is not the function of this court to make such judgments. *See State v. Carnemolla*, 229 Wis. 2d 648, 661, 600 N.W.2d 236 (Ct. App. 1999).

¶ 28. We do not agree with the State that the videotape of the interview conclusively demonstrates that Hindsley understood his rights but was simply ambivalent about whether to talk first to Sergeant Dowling or to an attorney. That is the inference the circuit court drew from the videotape after the first suppression hearing, but it is not the only reasonable inference. Hindsley's answers and questions as conveyed by Hernandez show confusion and misunderstanding, and their meaning is often not clear. Moreover, the inference the court drew at the close of the first hearing, and that the State urges us to draw now, implicitly assumes that Hindsley was able to understand what Hernandez was signing concerning his *Miranda* rights. When the court had more information—from Hernandez, from other experts in interpreting for the deaf who viewed the video, and from persons who had communicated with Hindsley in other situations—the court had more evidence with which to evaluate what the videotape showed about Hindsley's understanding.

¶ 29. We conclude the record supports the trial court's findings of historical fact that Hindsley's primary language was ASL; he did not have a proficiency level in English sufficient to understand the *Miranda* warnings; and Hernandez did not use ASL in interpreting for Hindsley.

¶ 30. We now turn to the State's argument that the trial court did not apply the correct legal standard to these historical facts. The standard, as articulated in *Santiago*, is that "the accused was adequately informed of the *Miranda* rights, understood them, and knowingly and intelligently waived them." *Santiago*, 206 Wis. 2d at 18. The warnings given the defendant must:

> convey the substantive message that the suspect has the right to remain silent; that anything the suspect says can be used against him or her in a court of law; that the suspect has the right to have a lawyer and to have the lawyer present if he or she gives a statement; and that if the suspect cannot afford an attorney, an attorney will be appointed for him or her both prior to and during questioning.

*Id.* at 19. "The waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 18–19. In addition, the court is to consider the totality of the circumstances. *See id.* at 27; *see also Lee*, 175 Wis. 2d at 361.

¶ 31. *Santiago* adds further definition to this standard when the suspect is advised of *Miranda* rights in a language other than English. The principal issue in *Santiago* was whether the State, in proving the sufficiency of the *Miranda* warnings and a knowing and intelligent waiver of *Miranda* rights, "must pre-

sent evidence of the words spoken by a law enforcement officer advising a suspect of the *Miranda* rights in a language other than English and the translation of the words." *Santiago*, 206 Wis. 2d at 10. In *Santiago*, a Spanish-speaking police officer gave the suspect the *Miranda* warnings in Spanish. At the suppression hearing the State did not present the words the officer used in Spanish and their translation into English, but only conclusory statements of the officer on what he told the suspect. The court decided this was insufficient to meet the State's burden of proof. The court held that, when the accused puts the State on timely notice that he or she is challenging the sufficiency of the *Miranda* warnings given in a foreign language or the validity of the waiver because of the foreign language warnings, the burden is on the State to produce evidence, in addition to the officer's conclusory statements, that the foreign language words reasonably conveyed the *Miranda* rights and that the waiver was knowingly and intelligently made. *See id.* at 25–26.

¶ 32. The State argues it has met the standard established in *Santiago* because it has made a record of the interview in the form of a videotape. It is true that, because the record of the interview has been preserved, the State in this case has passed the threshold requirement for meeting its burden of proof. But, as is evident from the court's discussion in *Santiago*, the purpose of preserving and presenting a record of the interview is to prove that the *Miranda* warnings were given in a language that the suspect understood. Indeed, the court begins its discussion with the statement that "[w]hen a suspect cannot communicate in English, law enforcement officers should give the *Miranda* warnings in a language the suspect understands in order to

ensure that the suspect comprehends the *Miranda* warnings and can knowingly and intelligently waive the *Miranda* rights." *id.* at 13.

¶ 33. The State argues the trial court applied a higher standard than that set forth in the case law because it required too great an understanding by Hindsley. The State emphasizes our statement in *Lee* that the suspect need not have a mental awareness that involves knowing every possible consequence of a waiver of the Fifth Amendment privilege, being totally rational and properly motivated when confessing, or having all the information that might be useful or affect one's decision to confess. *Lee*, 175 Wis. 2d at 364–65. Instead, the State points out, we said in *Lee* that the suspect need only be "cognizant at all times of 'the State's intention to use [his] statements to secure a conviction' " and of the fact that one can "stand mute and request a lawyer." *Id.* at 365 (citations omitted). (Rephrasing this latter requirement for this case, the suspect must be cognizant at all times that he or she may refrain from giving law enforcement personnel any information and may instead request a lawyer). We do not agree with the State that the trial court in this case required any greater level of understanding than was held necessary by the supreme court in *Santiago* or by this court in *Lee*. The trial court concluded the State had not met its burden of proving the *Miranda* warnings were provided in a language that Hindsley could understand, and this formulation is consistent with the standard established in both *Santiago* and *Lee*.

¶ 34. As an example that the court used a higher standard, the State points to the italicized portion of this statement by the court: Law enforcement personnel "obtained the translator who had the ability to

speak in the language of the defendant and through some almost fateful action, the language that was used with the defendant was not the defendant's language, [or] at least his first language, *his language of choice.*" (Emphasis added.) The State argues this is error because a suspect is not entitled to choose the interpreter or to insist on the warnings being given in one language when he or she can understand the one provided. We do not agree with the State's characterization of the circuit court's decision on this point. The court used various terms to describe Hindsley's relation to ASL. In the quoted sentence the court used three different terms—"defendant's language," "first language" and "language of choice"—and at other points the court used "primary language" and "the language of the defendant." However, it is plain from reading the court's entire ruling that it did not mean to convey different meanings with these terms; rather, they were different ways of phrasing the same critical finding that "the defendant uses ASL; that that's his primary language; that he's effective in that."[16] It is also plain from a reading of the entire ruling that the court did *not* apply a standard that permitted Hindsley to insist on the *Miranda* warnings being interpreted in ASL without regard to his proficiency in English or an English-based signing. Rather, the court applied a standard that required the warnings be given in a language in which Hindsley was proficient enough to understand the concepts that are involved in *Miranda* warnings. That is the correct standard.

---

[16] As we have said above, there was evidence that ASL was not the first language that Hindsley learned, that he learned another type of sign language as his first language.

¶ 35. According to the State, the trial court also erred because it did not take into account the totality of the circumstances and, in particular, its own finding that the police conduct was not coercive but was, in fact, very accommodating. This finding led to the court's conclusion that Hindsley's statement was voluntary. However, the court correctly recognized that whether a suspect knowingly and intelligently waived his or her *Miranda* rights is a separate inquiry from whether the statement is voluntary. In *Lee*, after analyzing the relevant United States Supreme Court and Wisconsin cases, we held that even when there is no police coercion and the statement is therefore voluntary, the State must make a separate showing that the waiver of *Miranda* rights is knowing and intelligent in order for the statement to be admissible. *Lee*, 175 Wis. 2d at 352, 356. It may be that in some cases evidence of coercive police conduct is related to the evidence that makes a waiver not knowing and intelligent; but it does not follow that evidence of efforts to accommodate a suspect's need for an interpreter shows that the suspect in fact understood his *Miranda* rights.

¶ 36. The State's third ground for asking us to reverse the circuit court's determination is the good faith effort of law enforcement to obtain an interpreter for Hindsley. Although there is no good faith exception under present case law for the requirement that *Miranda* rights be knowingly and intelligently waived, the State argues that the good faith exception recognized in certain circumstances under the Fourth Amendment, *see United Sates v. Leon*, 468 U.S. 897 (1984), should be applied in this case. At oral argument the State acknowledged that it is not the proper role of this court to create an exception to, or modify, binding

precedent of the Wisconsin Supreme Court or the United States Supreme Court. Accordingly, we do not further address this ground for reversal.

*Cross-Appeal—Voluntariness of Statement*

¶ 37. In determining whether a statement was voluntarily given, the inquiry is whether the statement was procured through coercive means or whether it was the product of improper pressures exercised by the police; and the totality of the circumstances surrounding the giving of the statement are examined. *See State v. Clappes*, 136 Wis. 2d 222, 236, 401 N.W.2d 759 (1987). We accept the trial court's findings of historical facts surrounding the giving of the statement unless they are clearly erroneous, and review de novo whether the historical facts as found by the trial court meet the constitutional standard of voluntariness. *See id.* at 235. Hindsley does not challenge any of the findings of historical fact made by the trial court, but argues that it did not apply the correct standard. According to Hindsley, when a trial court finds that the interpreter did not effectively communicate in the language used by a deaf suspect, the suspect's statement is involuntary. Hindsley relies primarily on *State v. Xiong*, 178 Wis. 2d 525, 504 N.W.2d 428 (Ct. App. 1993).

¶ 38. *Xiong* involved the issue of voluntariness in the context of the Fourth Amendment—whether consent to a search was voluntary. The person who gave consent in *Xiong* did not speak or understand English. We reaffirmed that the standard for the voluntariness of consent was distinct from that of knowing and intelligent waiver, relying on *State v. Rodgers*, 119 Wis. 2d 102, 110–11, 349 N.W.2d 453 (1984). *See Xiong*, 178 Wis. 2d at 532. We decided the standard for voluntariness established in *Clappes*, 136 Wis. 2d at 236, and

*State v. Michels*, 141 Wis. 2d 81, 90, 414 N.W.2d 311 ( Ct. App. 1987) (both considering the voluntariness of a suspect's statement); was applicable. *See Xiong*, 178 Wis. 2d at 532. Because those cases "suggest that police coercion and a defendant's personal characteristics are interdependent concepts," we held that overt police conduct was not the sole criterion for coerciveness, that "evidence that police are taking subtle advantage of a person's personal characteristics . . . may be a form of coercion." *Id.* at 534. We framed the issue of voluntariness as "whether the police took advantage of Mai Lee's lack of understanding of the English language and customs to gain consent." *Id.* at 536.

¶ 39. Based on the undisputed facts before us in *Xiong*, we concluded the consent to search was voluntary. *Id.* There was undisputed evidence that there was no overt police conduct of coerciveness; and there was an interpreter who translated the consent form and testified Mai Lee appeared to understand him and did not appear uncomfortable or afraid. Although there was evidence that Mai Lee did not receive an adequate definition of some of the terminology used, there was, we stated, no evidence suggesting that "Mai Lee's language and culture were barriers to her understanding that the police wanted to search her home." *Id.* at 537. Her "consent did not have to be fully informed; it merely had to be given in an atmosphere free of coercive influences." *Id.*

¶ 40. Hindsley emphasizes this statement in *Xiong*, 178 Wis. 2d at 537:

> We agree with the trial court that language barriers make a determination of voluntariness more difficult. It is incumbent upon the police to effectively communicate their objectives when seeking consent

to search. Merely providing an interpreter is not enough. The interpretation must convey what is intended to be communicated. Communication is effective only if it clearly and accurately relates to all pertinent information to the listener. If effective communication is not provided, then that is a form of coercion. There is no evidence that that is the case here.

¶ 41. We do not agree with Hindsley that *Xiong* supports the rule of law he asks us to adopt. The effective communication we referred to in the quoted statement concerned that which was necessary for Mai Lee to understand that the police were asking consent to search—in other words, from a voluntariness perspective, she had to understand she was consenting to a search, otherwise there was no consent.[17] The comparable inquiry here is whether Hindsley understood that the police wanted to ask him questions about the death of his son, and it is evident that he understood that, because he communicated much information about his son and his son's death to Sergeant Dowling.[18] *Xiong* does not change the standard for voluntariness, which was and remains focused on police coercion, and considers a person's language and culture only insofar as they bear on whether coercion by more subtle means, rather than by overt acts, took place. In this regard, in *Xiong* we referred to *Colorado v. Connelly*, 479 U.S. 157 (1986), which "cautions that a personal characteristic

[17] We said earlier in our decision in *Xiong*, 178 Wis. 2d 525, 536, 504 N.W.2d 428 (Ct. App. 1993), that "Mai Lee can hardly agree to something if she does not understand what is being asked of her."

[18] We are not concerned here with the accuracy of the translation of his statement, which is not an issue on this appeal, but with the general subject matter of it.

such as a person's mental condition cannot, by itself, and apart from its relation to official coercion, dispose of the inquiry into constitutional 'voluntariness.' " *Xiong*, 178 Wis. 2d at 534.

¶ 42. The standard for voluntariness that Hindsley asks us to apply departs from that which we applied in *Xiong* and that which is established in the Fifth Amendment cases we relied on in *Xiong*: Hindsley's proposed standard bases a conclusion on voluntariness solely on the suspect's personal characteristics. This is in essence the flip side of the State's argument, which we have rejected above—that the trial court's findings underpinning the conclusion of voluntariness compel the conclusion that there was a knowing and intelligent waiver. On this cross-appeal as on the appeal, we apply the binding precedent that treats the voluntariness of a suspect's statement and the knowing and intelligent waiver of *Miranda* rights as two separate requirements, with distinct standards for each. The trial court applied the correct standard in concluding that Hindsley's statement was voluntary.

*By the Court.*—Order affirmed.