PATIENCE DRAKE ROGGENSACK, C.J.
(dissenting).
¶ 95. Wisconsin's legislature repeatedly has enacted laws to lessen the carnage that drunk drivers inflict on those who use Wisconsin roads. Today, the majority opinion overturns legislation that holds those who drive with a prohibited alcohol concentration responsible for the injuries they cause by violating a traffic law when their intoxication is not readily apparent.
*374 ¶ 96. The majority opinion errs for three reasons: Adam M. Blackman's consent to blood tests was not obtained by law enforcement coercion; the majority opinion misinterprets the relevant statutes; and Deputy Sheriff Abler acted with a good faith belief that he was doing what the statutes required. Stated more fully: (1) Deputy Abler's reading the Informing the Accused form to Adam Blackman was not sufficient to overcome Blackman's free will such that the reaffirmation of his consent to evidentiary tests was coerced rather than voluntary; (2) the controlling statutes, correctly interpreted, comport with the deputy's reading the Informing the Accused form to Blackman; and (3) Deputy Abler, in good faith, read what he believed the statutes required. Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.
I. BACKGROUND
¶ 97. The majority opinion ably sets forth most of the factual background of this controversy, so I shall relate only those facts necessary to attuning the reader to my discussion that follows.
f 98. At approximately 10:00 in the morning while driving his automobile, Blackman made a left-hand turn from a county highway onto an intersecting street. In so doing, he crossed the path of an oncoming bicyclist, who collided with the right side of Black-man's car causing great bodily harm to the bicyclist.
f 99. While medical personnel were attending to the injured bicyclist, Deputy Sheriff Abler spoke with Blackman, who had remained at the scene of the accident. Abler testified that he believed that Black-man violated a traffic law by not yielding the right-of-way to the bicyclist when he made his left-hand turn.
*375 ¶ 100. Because of the great bodily harm that the bicyclist suffered, Abler asked Blackman to provide a blood sample. Blackman agreed and was taken to a local hospital for the blood draw. At the hospital, Abler read Blackman the Informing the Accused form. Wisconsin Stat. § 343.305(4) directs that it be read before a chemical evidentiary test is undertaken based on a driver's alleged traffic violation that causes great bodily harm to another person, i.e., a violation of Wis. Stat. § 343.305(3)(ar)2.
¶ 101. The Informing the Accused form describes civil penalties that may follow from refusing to permit a chemical test. The following questions were asked of the deputy about his interactions with Blackman and Blackman's consent to the evidentiary test in response to the Informing the Accused form.
Q Do you recall, did Mr. Blackman consent to an evidentiary chemical test of his blood?
A Yes, he did.
Q Okay. At that time do you recall, did Mr. Blackman have any questions for you about the nature of that form?
A No, I don't recall any questions.
Q Okay. At the time that was read, was Mr. Black-man confined in any way?
A No, other than the fact that we were just sitting in a room at the hospital.
Q Okay. Is there anything else that you can tell me that would give us some information as to whether or not Mr. Blackman was forced or coerced or threatened in any way to consent to an evidentiary chemical test of his blood?
*376 A No, he was not. In fact, he was very cooperative throughout the whole procedure.
[[Image here]]
THE COURT: Did you tell him why you were going to the hospital and why he should ride in your car?
THE WITNESS: Well I'm sure I told him that. I know I explained our normal procedure is when there is a serious accident like this that we do take blood samples.
THE COURT: Okay. So he knew he was going to the hospital for a blood sample?
THE WITNESS: Yes, he did.
THE COURT: Did he say anything to you about agreeing to have a blood sample and when you got in the car and before you guys took off to go to the hospital?
THE WITNESS: I don't know that he specifically agreed, but he did not disagree or refuse or give me any indication that he was going to refuse.
¶ 102. Blackman, who was 20 years of age on the date he was requested to give a blood sample, reaffirmed his consent and his blood was drawn.[1] The tests showed he had a .104 blood alcohol concentration. He was charged with several crimes that related to his unlawful blood alcohol concentration and the great bodily harm the bicyclist suffered.
¶ 103. Blackman moved to suppress the results of his blood test, claiming that his consent was not valid because the deputy misinformed him that he *377 faced the civil penalty of license revocation if he refused, when he actually faced only an arrest for refusing the blood draw. He also argued that if the implied consent law applied to him, and if his consent was valid, Wis. Stat. § 343.305(3)(ar)2. was unconstitutional, both facially and as applied to him.
¶ 104. The circuit court concluded that Abler did not misinform Blackman "because the potential for revocation was ultimately available through section (3)(a) if the refusal continued." However, the circuit court granted Blackman's motion to suppress because it concluded Blackman's consent was coerced when he was told that if he refused to permit a blood draw his operating privileges would be revoked. The court based this "coercion" on its conclusion that revocation for refusal under Wis. Stat. § 343.305(3)(ar)2. would be "statutorily unenforceable." The court concluded that Wis. Stat. § 343.305(9)(a)5.a. required the State to prove that Abler had probable cause to arrest Black-man for a driving while intoxicated offense when the deputy had no facts to support probable cause at the time the blood sample was taken.
¶ 105. The court of appeals reversed. It concluded that Blackman was correctly informed that if he withdrew the consent he first provided by driving on the Wisconsin roadways and refused to submit to the requested blood draw, his operating privileges would have been revoked. State v. Blackman, 2016 WI App 69, ¶ 1, 371 Wis. 2d 635, 886 N.W.2d 94.
¶ 106. The majority opinion disagrees with the court of appeals and suppresses the results of Black-man's blood test.
*378 II. DISCUSSION
A. Standard of Review
f 107. Whether Blackman's reaffirmation of his consent to search was voluntarily given, in contrast to being obtained by law enforcement coercion, is a question of constitutional fact. State v. Phillips, 218 Wis. 2d 180, 195-96, 577 N.W.2d 794 (1998). We apply a two-step process to make this determination. Id. at 191. Historical facts relevant to consent are affirmed unless clearly erroneous. Id. at 190. Voluntary consent is consent "given in the absence of duress or coercion, either express or implied." Id. at 197 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). Accordingly, voluntariness is a question of law that we decide after considering the totality of the circumstances. Id. at 198 (citing Schneckloth, 412 U.S. at 226)). The totality of circumstances include "both the circumstances surrounding the consent and the characteristics of the defendant." Id. (citing State v. Xiong, 178 Wis. 2d 525, 534-36, 504 N.W.2d 428 (Ct. App. 1993)).
¶ 108. This case also involves statutory interpretation and application. These are questions of law that we independently determine. State v. Hanson, 2012 WI 4, ¶ 14, 338 Wis. 2d 243, 808 N.W.2d 390.
1 109. And finally, whether Deputy Sheriff Abler read the Informing the Accused form to Blackman in good faith such that the exclusionary rule is inapplicable to the results of Blackman's blood tests is also a question of law. State v. Dearborn, 2010 WI 84, ¶ 33, 327 Wis. 2d 252, 786 N.W.2d 97.
*379 B. Coercive or Voluntary
¶ 110. The majority opinion concludes that Blackman's consent given in response to Abler's request for blood tests was not voluntarily given because it was coerced by Abler's reading the Informing the Accused form to Blackman. The form relates that refusal will result in revocation, when Blackman's driving privileges would not have been revoked if he had refused to provide an evidentiary sample.[2] In so concluding, the majority opinion totally ignores the legal principles that come into play when a court assesses whether a defendant's free will has been overcome by law enforcement conduct for purposes of the Fourth Amendment.
1. General principles
¶ 111. When the State asserts that a search was consensual, we must determine whether consent was voluntarily given. Phillips, 218 Wis. 2d 180, ¶ 23. The test for voluntariness of a search is "whether consent to search was given in the 'absence of actual coercive, improper police practices designed to overcome the resistance of a defendant.'" Xiong, 178 Wis. 2d at 532 (quoting State v. Clappes, 136 Wis. 2d 222, 245, 401 N.W.2d 759, 769 (1987)). Mere acquiescence to police authority, such as when police display a search warrant to a defendant and he permits entry into his home, is not coerced consent in the context that Black-man contends occurred herein. Rather, we consider a search done without a warrant that was based on law *380 enforcement's request to search and Blackman's response to that request. Schneckloth, 412 U.S. at 234.
¶ 112. Whether a defendant's will was overborne such that his consent to search was not voluntary requires us to examine the details of the interactions between law enforcement and the defendant and the characteristics of the defendant. Id. at 226. There is no one factor that will determine whether consent was coerced. As the United States Supreme Court has explained, "The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone." Id. at 229.
f 113. In regard to the interaction between law enforcement and the defendant, we examine whether law enforcement "threatened, physically intimidated, or punished the defendant," Phillips, 218 Wis. 2d at 199; whether the interactions between law enforcement and the defendant were under cooperative, nonthreatening conditions, id. at 200; whether the consent was the result of custodial interrogation, which the Supreme Court concluded was "inherently coercive" in Miranda v. Arizona, 384 U.S. 436 (1966). Schneckloth, 412 U.S. at 240.
¶ 114. Some factors relating to the defendant are: his youth, Haley v. Ohio, 332 U.S. 596, 599 (1948); education or lack thereof, Payne v. Arkansas, 356 U.S. 560, 562 (1958); low intelligence or mentally compromised, see Fikes v. Alabama, 352 U.S. 191, 196 (1957); questioning that occurred while defendant was in custody, State v. Michels, 141 Wis. 2d 81, 92, 414 N.W.2d 311 (Ct. App. 1987).
¶ 115. In a consent-search, it is the State's burden to show voluntariness; however, the State does not *381 have the burden to show that the defendant's consent was "informed consent." Phillips, 218 Wis. 2d at 203 (citing Xiong, 178 Wis. 2d at 532). Stated otherwise, the State has no obligation to prove that the defendant consented to the search knowingly and intelligently, or that the defendant knew he could refuse to permit the requested search. State v. Rodgers, 119 Wis. 2d 102, 109-10, 349 N.W.2d 453 (1984) (citing Schneckloth, 412 U.S. at 229-32).
¶ 116. Furthermore, the obligation to prove that a defendant's waiver of a trial right is knowing and intelligent is vastly different from the test for assessing the constitutional sufficiency of consent to search. Illinois v. Rodriguez, 497 U.S. 177, 183 (1990). As the United States Supreme Court has explained, "what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, ... or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable." Id. at 185.
2. Blackman's consent
¶ 117. There is nothing in the record that shows Abler coerced Blackman. No threats were made to obtain his consent to the blood draw. He was not punished by denying food, drink or rest periods. No coercive, improper police conduct designed to overcome Blackman's free will occurred. All that happened prior to the blood draw was Abler's reading the Informing the Accused form to Blackman.
f 118. In regard to Blackman, he was 20 years of age when the accident occurred. There is nothing in the record that would indicate he did not have the *382 capacity to freely consent, or withdraw consent, for the blood draw. He willingly went to the hospital and permitted blood to be drawn for testing. Deputy Abler said that "he was very cooperative throughout the whole procedure."
¶ 119. As I will explain below, I have concluded that the deputy properly read the Informing the Accused form, which Wis. Stat. § 343.305(4) requires. However, even if I were to assume that the form should not have been read because Blackman's driving privileges could not have been revoked if he refused to permit the blood test, law enforcement had no obligation to provide additional information to Blackman. Constitutionally sufficient consent may be obtained when the consent is not knowingly and intelligently given. Schneckloth, 412 U.S. at 229-32; Rodgers, 119 Wis. 2d at 109-10; Xiong, 178 Wis. 2d at 532. Reading the form simply gave Blackman a choice: he could say yes or he could say no.
¶ 120. Furthermore, if reading the Informing the Accused form to Blackman coerced his consent to a blood draw, reading the Informing the Accused form coerces every driver to whom it is read. All have the same choice: say yes or say no. Requiring that accurate consequences of refusing to permit a blood draw are known to the defendant before his consent is held to be voluntary is contrary to Schneckloth, Rogers and Xiong. Knowledge of the consequences of refusal is outside the scope of Fourth Amendment consent to search protections.
f 121. A common example shows the fallacy of the majority opinion's conclusion that Blackman's consent was coerced. Let's assume that a driver belongs to a religious sect that prohibits blood-letting. He refuses to give a blood sample after the Informing the Accused *383 form is read to him. The form is the same for all to whom it is read; yet, if a driver refuses to provide a blood sample based on a sincerely held religious belief, it is likely that his license will not be revoked. See Schmerber v. California, 384 U.S. 757, 771 (1966). Therefore, the form will not provide an accurate description of the consequences of refusing to provide the requested blood sample for such a driver.
¶ 122. No coercion forced Blackman to provide a blood sample. Coercion requires unlawful police conduct designed to override the free will of a defendant. There is nothing in this record to suggest unlawful police conduct; and there is nothing in this record to suggest that this 20-year-old man did not freely and voluntarily consent to the blood test.
C. Statutory Interpretation
¶ 123. Proper interpretations of Wis. Stat. § 343.305 and its subsections show that the deputy correctly followed directives established by the legislature, which included reading the Informing the Accused form, § 343.305(4), and upon refusal, a refusal hearing would have followed, § 343.305(9)(c).
1. General principles
¶ 124. Statutory interpretation begins with the language of the statute. If the meanings of the words chosen by the legislature are plain, ordinarily we stop the inquiry. State ex rel Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. "Plain meaning may be ascertained not only from the words employed in the statute, but also from the context." Prince Corp. v. Vandenberg, 2016 WI 49, ¶ 17, 369 Wis. 2d 387, 882 N.W.2d 371.
*384 f 125. Interpreting a statute in context requires that we do not interpret statutory language in isolation, but rather in relation to surrounding and closely-related statutory provisions. Id. Here, I interpret the subsections of Wis. Stat. § 343.305 as they relate to each other within Wisconsin's statutory scheme of implied consent.[3]
2. Relevant Statutes
¶ 126. Wisconsin Stat. §§ 343.305(3)(ar)2., 343.305(4), and 343.305(9) are implicated by Black-man's arguments that the majority opinion finds persuasive.[4] Accordingly, I interpret those provisions in the context of Wisconsin's implied consent law, as they relate to each other.
f 127. A vehicle operator whom a law enforcement officer has reason to believe committed a violation of a traffic law that caused great bodily harm to another may be charged with a violation of Wis. Stat. § 343.305(3)(ar)2. An alleged violation of § 343.305(3)(ar)2. permits a law enforcement officer to request the vehicle operator to provide one or more samples of breath, blood or urine. § 343.305(3)(ar)2. There is no dispute that that interpretation is what the statute plainly provides.
¶ 128. In regard to a request for samples to test for alcohol concentration, Wis. Stat. § 343.305(4) states in relevant part:
*385 At the time that a chemical test specimen is requested under sub. (3)(a), (am), or (ar), the law enforcement officer shall read the following to the person from whom the test specimen is requested:
You. . . are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person ....
This law enforcement agency now wants to test one or more samples of your breath, blood or urine .... If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties.
The Informing the Accused form, which is read before samples for chemical testing are secured, repeats the statutory admonitions of § 343.305(4). The plain wording of subsec. (4) requires the officer to read the statutory provisions. There is no dispute that the statutory provisions are contained within the Informing the Accused form.
f 129. Where I part company with the majority opinion is in its interpretation of Wis. Stat. § 343.305(9). It is not until there is a refusal and a timely request for a refusal hearing that § 343.305(9) comes into play. Neither of these events occurred in the pending matter. However, given the arguments made to us and the majority opinion's interpretation of the various provisions of subsec. (9), I, too, address § 343.305(9).
¶ 130. I begin with Wis. Stat. § 343.305(9)(c) because it is the paragraph in subsec. (9) that addresses refusal by a person from whom submission of a sample for testing was requested under subd. (3)(ar)2. Paragraph (9)(c) provides:
*386 If a law enforcement officer informs the circuit or municipal court that a person has refused to submit to a test under sub (3)(a), (am), or (ar), the court shall be prepared to hold any requested hearing to determine if the refusal was proper. The scope of the hearing shall be limited to the issues outlined in par. (a)5. or (am)5. Section 967.055 applies to any hearing under this subsection.
¶ 131. When a vehicle operator who is not a commercial motor vehicle operator refuses a request to submit a sample for testing based on a suspected violation of Wis. Stat. § 343.305(3)(ar)2., any requested hearing cannot encompass more issues than those identified in subd. (9)(a)5. However, there is nothing in para. (9)(c) that requires all three issues identified in subd. (9)(a)5. to be tried. Rather, the issues that must be tried are whether the officer complied with sub. (4), subd. para. (9)(a)5.b., and whether the person's refusal was due to a physical inability to submit to the requested test because of a cause unrelated to the use of a prohibited substance, subd. para. (9)(a)5.c.
f 132. Wisconsin Stat. § 343.305(9)(c) states that the "scope of the hearing shall be limited to the issues outlined in par. (a)5." It does not say that the issues outlined in para. (a)5. shall be tried.
¶ 133. When issues to be considered in a claim or a type of review are "limited," no unlisted issues can be considered, but every enumerated issue identified in the list does not have to be tried. For example, in certiorari review the issues are limited to:
(1) whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judg *387 ment; and (4) whether the board might reasonably make the order or determination in question based on the evidence.
FAS, LLC v. Town of Bass Lake, 2007 WI 73, ¶ 8, 301 Wis. 2d 321, 733 N.W.2d 287. However, there is no need to try all four issues in order to prevail; simply proving that the board did not proceed on a correct theory of law is sufficient. Id.
¶ 134. Furthermore, even though Wis. Stat. § 343.305(9)(a) 5.a. permits consideration of whether the officer had probable cause to believe the person was operating a motor vehicle with a prohibited alcohol concentration, nothing in para. (9)(c) requires that issue be tried. A plain reading of subd. (9)(a)5. in the context of Wis. Stat. § 343.305(3)(ar)2. demonstrates that requiring the State to litigate whether the officer had probable cause to believe the driver was impaired or had a prohibited alcohol concentration would make no sense because § 343.305(3)(ar)2. is based on the violation of a traffic law that causes death or great bodily injury, not on apparent intoxication.
3. Application of statutes to Blackman
f 135. Deputy Abler had reason to believe that Adam Blackman violated a traffic law by failing to yield the right-of-way to oncoming traffic, which caused great bodily harm to another. Accordingly, Blackman was alleged to have violated Wis. Stat. § 343.305(3)(ar)2. There is no question that the bicyclist suffered great bodily harm and no question that it was pursuant to § 343.305(3)(ar)2. that Abler requested that Blackman submit to a blood test. It is also beyond dispute that the deputy complied with Wis. Stat. § 343.305(4) by reading Blackman the Informing the Accused form.
*388 ¶ 136. Even though statutory interpretation arising from a refusal is not present in this case, if it were, I would conclude that Wis. Stat. § 343.305(9)(c) does not require that the issue of whether the deputy had probable cause to believe Blackman was impaired must be tried because Blackman was proceeded against pursuant to Wis. Stat. § 343.305(3)(ar)2. There is nothing in the record to show that if Blackman had refused, such refusal would be excused because of an inability to submit to blood tests. Accordingly, if he were to have refused, his driving privileges would have been revoked.
¶ 137. The legislature made a policy choice to test whether a vehicle's operator was under the influence of intoxicating substances when accidents cause death or great bodily harm. It did so because intoxication is not always readily apparent at the scene of a serious accident, but can nevertheless have contributed to loss of life and serious injuries. That policy choice is Wis. Stat. § 343.305(3)(ar)2.
f 138. Blackman's blood test showed a prohibited alcohol concentration of .104, well above the legal limit of .08 for an adult, and absolutely prohibited for a man who was underage to drink any alcohol on the date of the accident.
D. Good Faith
¶ 139. Even if I were to assume that Blackman's consent was coerced and were to agree with the majority opinion's statutory interpretation, I nevertheless would conclude that the good faith exception to the exclusionary rule applies; and therefore, I would not suppress the results of the blood test.
f 140. At the outset, I note that the majority opinion incorrectly frames the exclusionary rule as a *389 remedy courts apply liberally. Without citation, the majority opinion states: "Ordinarily, evidence obtained through an unlawful search is excluded at trial."[5] This is contrary to well-established law when innocent police conduct is the foundation from which objection to a search arises.
I 141. The Supreme Court has concluded that "the [exclusionary] rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." Pennsylvania Bd. of Probation v. Scott, 524 U.S. 357, 364-65 (1998) (quoting United States v. Payner, 447 U.S. 727, 734 (1980)). The Supreme Court has repeatedly stated that " [suppression of evidence" should be the "last resort, not our first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006); see also Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016); Herring v. United States, 555 U.S. 135, 140 (2009). We have used similar admonitions when describing the exclusionary rule. Dearborn, 327 Wis. 2d 252, ¶ 35 (reasoning, "exclusion [of evidence] is the last resort").
f 142. "The rule's sole purpose ... is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. 229, 236-37 (2011). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.' " Id. at 237 (quoting United States v. Janis, 428 U.S. 433, 454 (1976)). "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield '[meaning-fu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' " Davis, 564 U.S. at 240 (quoting Herring, 555 U.S. at 141).
*390 ¶ 143. Moreover, "marginal deterrence is not enough to justify exclusion; 'the benefits of deterrence must outweigh the costs.'" Dearborn, 327 Wis. 2d 252, ¶ 35 (quoting Herring, 555 U.S. at 129). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" Herring, 555 U.S. at 141 (quoting United States v. Leon, 468 U.S. 897, 908 (1984)). Given the high cost to society of excluding probative evidence against a defendant in a criminal trial, suppression of the evidence is "the last resort" and the burden is on the defendant to show that exclusion is warranted. Scott, 524 U.S. at 364-65.
¶ 144. Good faith is a well-defined exception to the exclusionary rule. See Dearborn, 327 Wis. 2d 252, ¶ 37. "The exclusionary rule does not serve its purpose when police act with a reasonable, good faith belief that their conduct is lawful." State v. Oberst, 2014 WI App 58, ¶ 9, 354 Wis. 2d 278, 847 N.W.2d 892; see also Leon, 468 U.S. at 919 ("We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." Herring, 555 U.S. at 145 (internal quotations omitted).
¶ 145. The good faith exception applies when an officer relies on a statute that is later found unconstitutional.[6] Illinois v. Krull, 480 U.S. 340, 349-50 (1987). *391 "Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." Id.
¶ 146. In the present case, there is no deterrent value in suppressing the results of Blackman's blood test. Deputy Abler was required to read the Informing the Accused form to Blackman. Specifically, Wis. Stat. § 343.305(4) provides that "the law enforcement officer shall read the following to the person from whom the test specimen is requested." Excluding the results of Blackman's blood test "will not deter future Fourth Amendment violations" because the "officer . . . simply fulfilled his responsibility to enforce the statute as written." Krull, 480 U.S. at 349-50.
f 147. The deputy did not act with "deliberate, reckless, or grossly negligent conduct" and therefore, this case is not one in which suppression would yield "appreciable deterrence." Weighed against the high societal cost of exclusion, suppression of the blood test is not warranted in the present case. After all, suppression is the "last resort." The deputy did that which he was statutorily obligated to do; nothing more, nothing less.
*392 ¶ 148. The majority opinion concludes that suppression is necessary to deter officers from continuing to read individuals "in the same situation as Black-man" the Informing the Accused form.[7] However, this argument fails for an obvious reason: After the majority opinion in the present case concludes that it is impermissible for an officer to rely solely on reading the Informing the Accused form to obtain consent when a defendant is alleged to have violated Wis. Stat. § 343.305(3)(ar)2., an officer that does so will be unable to rely on the good faith doctrine. Cf. Leon, 468 U.S. at 924 ("Nor are we persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state.").
¶ 149. Additionally, the United States Supreme Court has " 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." Davis, 564 U.S. at 240. In this case, the purported "misconduct" was the incorrect information provided to Blackman. Ironically, the author of the majority opinion has previously permitted officers to misinform an individual of the consequences of refusal specific to that individual. See Washburn Cty v. Smith, 2008 WI 23, ¶ 80, 308 Wis. 2d 65, 746 N.W.2d 243. In Smith, an officer read an individual with a Louisiana driver's license the Informing the Accused form. Id., ¶ 53. The Court recognized that the penalties in the form did not apply to the individual. Id., ¶ 54. Yet, the Court held that the misinformation provided to the defendant was irrel *393 evant so long as the officer correctly read the Informing the Accused form. Id,., ¶ 81. Here, the officer also read the Informing the Accused form correctly even if the penalties in the implied consent laws were not accurate with respect to the defendant.
¶ 150. In sum, the deputy acted in good faith and his actions were confirmed by the court of appeals. Accordingly, I conclude that even if I were to assume that Blackman's consent was coerced and were to agree with the majority opinion's statutory interpretation, the good faith exception to the exclusionary rule would apply, and the results of the blood tests are admissible.
III. CONCLUSION
f 151. I conclude that: (1) Deputy Abler's reading the Informing the Accused form to Adam Blackman was not sufficient to overcome Blackman's free will such that the reaffirmation of his consent to eviden-tiary tests was coerced rather than voluntary; (2) the controlling statutes, correctly interpreted, comport with the deputy's reading the Informing the Accused form to Blackman; and (3) Deputy Abler, in good faith, read what he believed the statutes required. Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.

 The record reflects that Adam Blackman was born November 23, 1992 and his blood sample was drawn on June 22, 2013, the date of the offenses.

 "He was incorrectly informed that his operating privilege would be revoked if he refused the request for a blood draw." Majority op., ¶ 61.

 I note that the "purpose behind the implied consent law is to combat drunk driving 'by facilitating] the gathering of evidence against drunk drivers.'" State v. Piddington, 2001 WI 24, ¶ 17, 241 Wis. 2d 754, 623 N.W.2d 528 (quoting State v. Neitzel, 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980)).

 Majority op., ¶¶ 30, 44.

 Majority op., ¶ 68.

 The good faith exception is not cabined to the factual circumstances in which it has previously been aFpplied by the *391 United States Supreme Court. See People v. LeFlore, 32 N.E.3d 1043, 1050 (Ill. 2015) ("Clearly, application of the good-faith inquiry is not limited to the specific circumstances addressed by the Supreme Court in Davis [v. United States, 564 U.S. 229 (2011)] or any other Supreme Court case."); United States v. Stephens, 764 F.3d 327, 337 (4th Cir. 2014) (declining to limit "the good-faith inquiry only to the precise factual circumstances addressed by the Supreme Court").

 Majority op., ¶ 73.